**In re KO.W. and K.W.**

Nos. 98–FS–128, 98–FS–187.

District of Columbia Court of Appeals.

Argued April 17, 2001.
Decided June 7, 2001.

Annie R. Alexander, appointed by this court, for appellant.

Sheila Kaplan, Assistant Corporation Counsel, with whom Robert R. Rigsby, Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for appellee, the District of Columbia.

Before WAGNER, Chief Judge, and SCHWELB and GLICKMAN, Associate Judges.

SCHWELB, Associate Judge:

S.S., the father of respondents K.W., born on February 23, 1989, and Ko.W., born on November 24, 1990, appeals from an order barring all visitation between him and his sons. The order was entered without an evidentiary hearing, and the trial court has never made a finding regarding whether the key allegation against the father, namely, that the father sexually abused K.W., was true or false. On appeal, the father contends, in substance, that the denial of visitation was based on an inadequate factual record and insufficient findings, and that the trial judge failed to apply the correct legal standard. We agree and reverse.

## I.

## BACKGROUND

On December 11, 1995, the principal of the elementary school that K.W. was attending called the police to report that D.W., the mother of the two respondents, had struck K.W., then six years old, in the face with her fist, causing a black eye and other bruises. The mother told the police that she felt depressed, and she admitted striking her son. Both respondents were removed from the mother's home and placed in the custody of the Department of Human Services (DHS).

On December 18, 1995, an Assistant Corporation Counsel petitioned the court for an order declaring both boys to have been neglected by the mother. The petition contained no allegation against the father. Attorneys were appointed for the mother and for the father, and a guardian *ad litem* was appointed for the respondents. The court conditionally released both boys to G.W., their maternal aunt, pending further order of the court.

On March 14, 1996, the mother entered into a stipulation with the District and with the guardian *ad litem*. In the stipulation, the mother acknowledged that she had struck K.W., as alleged, that she had been depressed at the time, and that her "depression was caused in part by inappropriate use of drugs, specifically cocaine." The mother admitted that she was "presently unable to provide proper control and supervision over the respondents," but she agreed to participate in drug therapy and parenting classes "with a goal of drug rehabilitation of the mother and reunification of the mother and the children." It was agreed that the respondents would continue to live with their maternal aunt pending final disposition. The father was not a party to the stipulation, and no finding was made that he had neglected or abused either of the respondents.

On May 15, 1996, the trial judge entered a disposition order in conformity with the stipulation. The respondents were placed in the third-party custody of the maternal aunt. The disposition order also authorized supervised visitation of the children by the mother. The order further stated:

> Visitation is PROHIBITED for [the father for] the following reasons:
> Allegations of abuse against respondents.

The prohibition against visitation by the father was apparently based on the following passage in the pre-disposition report, which had been prepared for the court by Andrew T. Donelan, a DHS social worker:

> Both children are presently doing very well in the care of their maternal aunt. However, within the past few months, their maternal aunt found the two boys engaged in some sexual activity together. Upon talking to the children about this incident, the boys

reported having seen their parents engage in sexual intercourse together. The older boy (K.W.) also reported that his father, [S.S.], would lie down on top of him. Based on these reports, the boys were referred to the Child Protection Center at Children's Hospital for a sexual abuse evaluation in late March.[1]

At the time that visitation by the father was prohibited, the father had not yet been served with any papers in the case, nor had he appeared in court.

According to representations made to the trial court by the father's appointed attorney,[2] the attorney was first able to locate her client in the late summer of 1996. It appears that the father had been made aware of the court case, but he apparently believed that the proceedings were against the mother only, and that they did not concern him. The father appeared in court for the first time at a review hearing on September 10, 1996, and he requested that he be permitted to visit his two sons. In an order entered at the conclusion of that hearing, the trial judge continued in effect the prohibition against visitation by the father.

On September 17, 1996, the father, through appointed counsel, filed a "Motion to Compel Visitation Rights of Father." In his motion, the father denied that he had engaged in any improper conduct vis-a-vis K.W., and he claimed that K.W.'s mind was being poisoned against the father by the maternal aunt:

Neither the Metropolitan Police Department Complaint nor the Superior Court of the District of Columbia Family Division PETITION allege[s] any misconduct by the father toward his children. The mother is the named abuser in both the complaint and the petition.

However, in court the mother and the caretaker made some unsubstantiated allegations based on speculations and interpretations from drawings on the children's walls, misbehavior by the children when the father was not around, and a statement by seven year old [K.W.] that his father got on top of him. This statement was repeated to [the social worker] during testing at The Washington, Assessment and Therapy Services (WATS). During the test [K.W.] described his worst memory as the time "my father got on top of me." No other description is given of the alleged incident. Whether or not the incident took place, or was rough housing or some type of disciplinary action that was not at all of a sexual content is not discussed. Most importantly, whether or not the child is simply remembering an actual occurrence or a suggestion implanted in his mind by his caretaker, his maternal aunt, [G.W.,] or others was not discussed. At the 9–10–96 court review, the father reports he never sexually abused his child and that [G.W.] has publicly accused him of being a rapist. This accusation was

---

1. Additional details of the father's alleged misconduct vis-a-vis his older son emerged at later stages of the case. In an assessment of K.W. dated August 6, 1996, a psychologist reported that K.W. recalled his "worst memory" as the time "my father got on top of me." According to a February 18, 1997 report by a different psychologist who had evaluated the father, there had also been "an allegation,

reportedly made by [the mother], that [K.W.] told her that [the father] had made [K.W.] perform oral sex on [the father]."

2. Because no sworn testimony was taken in this case, the facts related herein are based on representations by counsel, by DHS social workers, and by individuals who assessed or treated the various participants.

made in the presence of the children. She has repeatedly made derogatory remarks about the father in front of the children and made attempts to turn the children against their natural father (at the last court hearing [the] attorney for the father ask[ed] the court to prohibit the caretaker from continuing her attempts to turn the children against their father).

A child of a tender age as [K.W.] can actually be made to believe that something happened even though it never happened. When an event is retold time and time again to a child the child can easily believe that it is true.

Notwithstanding the father's efforts to resume contact with the respondents, his motion for visitation rights remained pending for more than seventeen months. Following each review, the judge extended the prohibition against visitation by the father on account of the prior "allegations of sexual abuse." No hearing was held to determine whether or not the sexual abuse had in fact occurred. The judge did attempt, however, to develop more information regarding whether visitation by the father would be in the respondents' best interest. In an order dated December 31, 1996, the judge referred the father for psychological evaluation and for drug testing.

On February 7, 1997, the father appeared for a psychological evaluation at DHS' Youth Forensic Services Division. In his report of that evaluation, the examining psychologist concluded that the father was more likely to abuse his sons physically than sexually. The psychologist expressed the view that although custody should not be awarded to the father, supervised visitation by the father would not be unreasonable:

While achieving visitation with his sons appears to be a realistic goal for him, his goal of having full custody and parenting them appears to be quite unrealistic. It is unlikely, given the results of this evaluation, that [the father] could adequately parent or care for the children at this time. If he is granted visitation privileges, they should be supervised, and should be closely regulated by observations of [K.W.'s] and [Ko.W.'s] reactions.

With respect to the results of the drug testing, counsel for the District represented at a hearing on October 2, 1987, that the father had tested positive for cocaine, most recently on April 15, 1987. The father did not contest this assertion. According to representations made to the court by the father's attorney, however, the father attended drug testing regularly, and his urine tested positive twice for the presence of cocaine but negative thirty-one times. This representation by counsel for the father was not contradicted by any other participant at the hearing.

On March 13, 1997, the judge directed that the father participate in parenting classes, in a domestic violence program, and in Narcotics Anonymous/Alcoholics Anonymous. The father's compliance (or lack thereof) with these directives is disputed by the parties. On September 30, 1997, the DHS social worker prepared a "Permanency Planning Hearing Report" in which he recommended that the court's goal for the two respondents be changed from reunification of the family to adoption.

## II.

## THE HEARING AND THE COURT'S ORDER

A "permanency planning" hearing for K.W. and Ko.W. was scheduled for October 3, 1997. On the day of the hearing, the father's attorney filed what she

termed a "Motion for Return of Children to Biological Father or to Biological Mother and Father and Motion in Opposition to Recommendation for Adoption." In her motion, counsel represented that the respondents' father and mother were living together and that they intended to be married. The father again denied the allegations of sexual abuse, and he claimed that his innocence had been "confirmed" by the police and by the results of his psychological evaluation. With respect to his compliance with the conditions imposed by the court, the father represented:

> To date [the father] has attempted to gain the court's permission to visit his children. He has complied with the court's order for drug testing and has not tested positive since April 15, 1997. Drug records indicate that since December, 1996 until May of 1997, [the father] tested positive two times and negative 31 times. The last positive was on April 15, 1997 (almost six months ago). [The father] fulfilled his testing requirements on April 11, 1997 but continued to test until May 20, 1997. [The father] has attempted to enter the NA program and has asked his counsel to assist him in that area. He has also attended parenting class. He was under the impression that the Psychological evaluation fulfilled his therapy requirements, but having been informed that he is required to obtain therapy, indicated a willingness to undergo therapy.

The father asked that the respondents be returned to the custody of their parents or, in the alternative, that the goal remain family reunification and that he be permitted, in the interim, to visit and communicate with the respondents.

The October 3 hearing began with an extended discussion between the judge and the attorneys regarding whether or not an evidentiary hearing would be necessary to resolve the issues before the court. Anticipating an evidentiary hearing, the Assistant Corporation Counsel had subpoenaed several witnesses, including the mother and the father. The father's attorney represented to the court that she wished to call at least two witnesses, and perhaps more. The mother's attorney stated that if there was to be an evidentiary hearing, he was not prepared to proceed. The judge ultimately "finessed" the "evidentiary hearing" issue, stating: "Well, let's go on and see how far we can go." The hearing was completed without the swearing of a witness and without the taking of formal testimony.

Andrew Donelan, the DHS social worker, made an oral report to the court.[3] Mr. Donelan stated that the father had appeared for his psychological evaluation, that he had attended at least three parenting classes, but that he had not gone to his first AA/NA meeting until the day before the hearing.[4] Donelan represented that both parents had failed to appear at a number of scheduled meetings with him at DHS, and that these failures had resulted in a delay in their attendance at parenting classes and had made it difficult to proceed with various referrals. Donelan confirmed that there appeared to have been a misunderstanding regarding whether, after having appeared for his psychological

**3.** Much of Mr. Donelan's report was devoted to the mother's performance of her responsibilities. We focus here on that part of the report that describes the conduct of the father.

**4.** The father's attorney represented that the father was working full time and overtime and that the original referrals for AA and NA were in Virginia and not readily accessible. The meeting that he attended was at a convenient location in northwest Washington, D.C.

assessment, the father was also required to participate in ongoing therapy. Finally, Mr. Donelan stated that he had attempted to enroll the father in a domestic violence class at the Superior Court, but he explained that the domestic violence charges against the father had been dismissed and that the father was apparently ineligible for the class. Mr. Donelan concluded by stating that the maternal aunt had done an excellent job in caring for the respondents and that she had signed a letter of intent to adopt the children.

After further extensive debate and discussion between the attorneys, the judge suggested:

> Maybe the thing to do now is give [the parents] an opportunity and let's see just how serious they are, well-intentioned they are in doing what it is that they need to do in order to achieve the goal of reunification.

The judge inquired whether "there is any objection to granting the father visitation, even if it's at the Department of Human Services, supervised." The social worker responded that before such visitation took place, "I would like to get a current assessment from the two therapists of [K.W.] and [Ko.W.]."

Following the hearing, the two boys were examined by two different social workers. The individual who examined K.W. characterized the question of visitation with K.W.'s father as "complex." According to the social worker, K.W. "expressed some curiosity about his father," and "[c]ontact with [the] father at a future date would probably be helpful." The social worker recommended, however, that planning for visitation should proceed with caution, and that ideally, visitation should begin "at a point when [K.W.] experiences some inner strength and security."

The social worker who examined Ko.W. approached the task of assessing the boy's state of mind somewhat obliquely. She reported that in a scenario in which the children were asked to set rules for their parents and for themselves, "[Ko.W.] expressed a willingness and readiness to see his mother and felt it was okay for her to come to the aunt's house. It was also stated as a rule by him that he would continue to live with his aunt. He did not invite his father to the house." Further, when the subject of a possible site for a visit was broached, "there was no suggestion and real reticence to accept a neutral area like Children & Family Services where the visit would be supervised."[5] Although the report did not so specify, the social worker apparently believed that Ko.W.'s failure to "invite his father into the house" or to suggest a meeting at a DHS office indicated that visitation ought not to be authorized.

On December 23, 1997, the trial judge issued a memorandum opinion and order and held that "the goal in this matter is changed from reunification to adoption." With respect to the issue of visitation, the judge wrote as follows:

> On September 17, 1996, respondents' father moved to compel visitation. [The father] was denied visitation with respondents on May 15, 1996 pending investigation into an allegation that he sexually abused [K.W.].[6] Although contact with both parents is presumed to be in the best interest of the child, visitation may be denied if it would be detrimental to the child. *In*

---

5. At the time of this assessment, Ko.W. was barely seven years old, and it is difficult to understand how he could have been expected to "suggest" a "neutral" meeting place.

6. The judge stated that the results of the police investigation were inconclusive because K.W. was reportedly uncooperative.

*re M.D.,* 602 A.2d 109, 114–5 (D.C. 1992). At the December 31, 1996 hearing on the father's motion to compel visitation, the motion was held in abeyance pending a psychological evaluation of the father.

[The father's] February 1997 psychological evaluation states he is more likely to physically abuse than to sexually abuse his children and recommends individual psychotherapy and domestic violence counseling to address his propensity toward violence. Because [the father] has not followed through with individual psychotherapy or domestic violence counseling, his propensity to abuse respondents has not been and cannot be evaluated. Moreover, [the father] has not made any other efforts which would demonstrate a desire to visit respondents, such as completing parenting classes or addressing his substance abuse problem.

Reports as recent as November 1997 from respondents' therapists state neither child is psychologically ready or willing to resume contact with [the father]. *See Lewis v. Lewis,* 637 A.2d 70 (D.C.1994) (upholding decision not to allow visitation as long as children would suffer emotional injury). In light of [the father's] failure to address the issues which resulted in denial of visitation, respondents' psychologically vulnerable state, and the change in goal to adoption, the Court finds visitation with [the father] is not in the best interests of the children.

### III.

### LEGAL DISCUSSION

A. *Jurisdiction and standard of review.*

 An order denying a parent the right to visit his child is appealable, not-

withstanding that proceedings to terminate parental rights have not been instituted. *In re D.M.,* 771 A.2d 360, 363–65 (D.C. 2001). The proper disposition of a neglected child, including the question whether a non-custodial parent should be granted visitation rights, is committed to the sound discretion of the trial court; the exercise of that discretion is reviewable only for abuse. *Id.* at 365 (citations omitted); *see also Lewis v. Lewis,* 637 A.2d 70, 72 (D.C. 1994).

 As we explained in *In re J.D.C.,* 594 A.2d 70, 75 (D.C.1991), however,

> [j]udicial discretion must ... be founded upon correct legal principles, *Conrad v. Medina,* 47 A.2d 562, 565 (D.C.1946), and a trial court abuses its discretion when it rests its conclusions on incorrect legal standards. *Jett v. Sunderman,* 840 F.2d 1487, 1496 (9th Cir.1988); *see also Johnson* [*v. United States* ], 398 A.2d [354], 365 [ (D.C. 1979) ]. Moreover, "[a]n informed choice among the alternatives requires that the trial court's determination be based upon and drawn from a firm factual foundation. . . . [I]t is an abuse [of discretion] if the stated reasons do not rest upon a [sufficient] factual predicate." *Johnson, supra,* 398 A.2d at 364 (citations omitted).

(Footnote omitted.) "A [trial] court by definition abuses its discretion when it makes an error of law." *Koon v. United States,* 518 U.S. 81, 100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). The question before us is whether the judge's exercise of discretion was undermined by the judge's failure to apply the correct legal standard and, especially, by the lack of a firm factual foundation for the action taken by the court.

B. *The father's rights.*

 The right of a parent to raise his or her child is of constitutional dimen-

sion; it has been characterized as "essential" and as "far more precious than property rights." *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (citations, internal quotation marks, and ellipsis omitted). Moreover, "the fundamental liberty interest of natural parents in the care, custody and management of their children does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the state." *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *see also In re N.H.,* 569 A.2d 1179, 1182 (D.C.1990). A parent's right to custody is not absolute. *N.H., supra,* 569 A.2d at 1182. The court must act in the child's best interest and may not expose the child to serious risk of harm. *In re S.L.E.,* 677 A.2d 514, 519 (D.C.1996). Nevertheless, a father's interest in retaining custody of his children is both legally cognizable and substantial, *Stanley, supra,* 405 U.S. at 652, and may not be overridden in the absence of persuasive evidence that the children's well-being requires that custody be placed elsewhere.

In the present case, the restriction on the father's association with the respondents is more extreme than a denial of custody.[7] For more than five years, the father has been deprived of any opportunity for visitation with his sons. Both boys are now in their teens; they were seven and five respectively when the ban on visitation was first issued.[8] As a practical matter, for more than half a decade, the father's situation has closely resembled that of an individual whose parental rights have been terminated. From the father's quite reasonable perspective, this has been a drastic curtailment of his rights as a parent, which could properly be imposed only upon a persuasive showing that visitation by him would imperil the well-being of his sons.

We have recognized that a non-custodial parent has *"the right of visitation* with the children and ought not to be denied that right unless by his conduct he has forfeited his right, or unless the exercise of the right would injuriously affect the welfare of the children." *In re M.D.,* 602 A.2d 109, 112 (D.C.1992) (emphasis in original) (quoting *Surrey v. Surrey,* 144 A.2d 421, 423 (D.C.1958)). Visitation should be permitted "unless the chancellor is convinced that [it would be] detrimental to the best interests of the infant." *Id.* (citations and internal quotation marks omitted). The applicable Superior Court rule is consistent with the case law, and provides that during the pendency of a neglect proceeding, the court should authorize visitation at least on a weekly basis unless such "at least weekly visitation would *create imminent danger or be detrimental to the well-being of the child."* Super. Ct. Neglect R. 14(b) (emphasis added).

Even the "temporary placement of a neglected child [with a non-parent] can substantially interfere with a natural parent's right to develop a relationship with a child." *In re J.F.,* 615 A.2d 594, 598 (D.C. 1992). The long-term denial of visitation rights will interfere with that right even more severely; in the present case, for five years, the father has been denied any contact whatever with the two respondents.

---

**7.** In fact, the father has not appealed from that part of the trial judge's order which declined to award custody to the father alone or to the father and mother jointly.

**8.** Much of the delay appears to be attributable to technical problems since the notices of appeal were filed.

## C. *Analysis.*

The trial judge made reference to several justifications for the complete prohibition against visitation which the trial judge imposed on the father:

1. the father's alleged sexual abuse of K.W.; [9]

2. the father's alleged failure to cooperate with the court and with the social worker during the pendency of the case; [10]

3. the father's lack of initiative in seeking reunification with his sons from 1995 to September 1996; and

4. the change of the goal for the respondents from family reunification to adoption.

We address each of these issues in turn.

### (1) *The alleged abuse.*

■■■ A father's sexual abuse of his young son would fill any reasonable person with revulsion. Unfortunately, such cases are not so very rare in this jurisdiction, but the comparative frequency with which the sexual exploitation of defenseless children may occur should not be permitted to mask its unremitting horror. If the father in fact forced K.W. to perform oral sex upon him, or if he lay on top of his son in a sexual manner, then the father should arguably be remitted to a facility from which the issue of visitation would be moot for years to come. But the "if" in the preceding sentence is a big one. If the father was falsely accused of these shameful deeds, then the unfairness of a baseless allegation should not be compounded by a prohibition of all contact with both of the respondents.

In the present case, the evidence of misconduct by the father consists exclusively of hearsay statements allegedly made by K.W. to his aunt, to his mother, and to a therapist. The original accusation—that his father lay on top of him, and that this was K.W.'s worst moment—is somewhat ambiguous in relation to whether the alleged incident involved sexual exploitation or some kind of horseplay. The allegation regarding oral sex appears to have emerged after the ban on visitation was imposed. The father has denied any sexual abuse, and he has claimed that the maternal aunt, who is alleged to be hostile to him, may have influenced K.W.'s account. K.W. apparently made no allegations against the father when K.W. was interviewed by the police, and no criminal charges were ever brought against the father. Yet the father has been denied all visitation with his sons without ever having been given the opportunity to rebut the serious hearsay allegations against him.

An exercise of discretion must, as we have noted, rest on a firm factual predicate. *Johnson, supra,* 398 A.2d at 364. In this case, the judge knew, at least from May 1996 on, that the father had been *accused* of sexually abusing his young son. The judge also knew that the father had denied the charge.[11] The fact most critical to an informed exercise of discretion was whether the allegations against the father were true or false-did he do it or didn't he? But this potentially dispositive question has never been resolved, and no evidentia-

---

9. The judge also mentioned the concern that the father might abuse the boys physically.

10. The judge indicated that this failure to cooperate on the part of the father made it difficult to determine whether visitation would pose a danger to the boys.

11. Somewhat ironically, the mother, who admitted that she has neglected her sons and that she punched K.W., has been permitted to visit the respondents. The father, who was never charged with neglect at all, and who has not been found to have abused either respondent in any way, has been denied visitation for several years.

ry hearing has ever been held. Thus, the ban on visitation by the father could not have been imposed on the basis of a finding that the father had abused K.W., for no court has ever found that he did so. Rather, the father has been denied any association with his sons on the basis of second-hand and third-hand hearsay allegations of abuse.[12] Moreover, he has never been given the opportunity to tell his side of the story, under oath, to the judge as the trier of fact. In our view, an evidentiary hearing was called for as soon as these disputed allegations came to light, so that the judge could determine whether or not the father "did it." If the father sexually abused K.W., then a prohibition against visitation was presumptively reasonable. If, on the other hand, the father was innocent, then the prohibition perpetuated an injustice which can no longer be altogether undone, but which certainly ought not to be prolonged without some compelling reason.

 It is true that, in her initial motion to enforce visitation rights, the father's attorney did not explicitly request an evidentiary hearing. If such a request had been made when the issue first arose, or if the judge had ordered such a hearing on his own initiative, the case might well have taken a significantly different course.

At the hearing on October 3, 1997, however, the father's attorney explicitly stated that she proposed to call witnesses (presumably including her client, who hoped to clear his name). Nevertheless, the father was never given the opportunity to testify, and his request for visitation was denied on the basis of proffers,[13] and without an evidentiary hearing or a finding as to whether the father did or did not abuse K.W.

Although other reasons for the denial of visitation were offered, it was the allegations of sexual abuse that animated the judge's initial concern and that remained at the heart of the issue. These allegations have yet to be resolved. Indeed, no attempt has been made to resolve them. Given the nature of the rights at stake, we are constrained to conclude that the trial judge abused his discretion by prohibiting visitation without conducting a factual inquiry, and without making a finding, as to whether the accusations against the father were true or false.[14]

The psychologist who examined the father expressed the view that the father was more likely to abuse the respondents physically than sexually. As far as we can discern from the record, however, there is no evidence that the father physically abused either of his sons, although he did

---

12. Although we do not suggest that in-court testimony by K.W. is the only possible way of ascertaining the facts, it is significant that none of these accusations has been tested by cross-examination, which is "the greatest legal engine ever invented for the discovery of truth." *Tyree v. Evans*, 728 A.2d 101, 103 (D.C.1999) (quoting 5 JOHN HENRY WIGMORE, WIGMORE ON EVIDENCE § 1367, at 32 (Chadbourn rev. ed.1974)). Indeed, so far as the record shows, none of the allegations would be admissible in evidence.

13. "A mere proffer is not evidence." *In re R.E.G.*, 602 A.2d 146, 148 (D.C.1992). A finding as to a critical disputed fact cannot be made on the basis of an unsubstantiated prof-

fer. *Id.* Whether or not the father sexually abused K.W. was a critical and disputed question of fact.

14. We recognize that the conscientious trial judge gave much thought and attention to this sensitive and difficult case. We therefore reiterate that "abuse of discretion is a phrase which sounds worse than it really is." *King v. United States*, 550 A.2d 348, 353 n. 3 (D.C. 1988) (citation omitted). A disagreement between the trial court and the appellate court on a point of law obviously "does not imply any reflection on the [trial] judge." *Id.* (ellipsis omitted).

allegedly beat the mother. The orders imposing and continuing the ban on visitation all refer to the *sexual* abuse allegations. It is difficult to believe that the potentiality of physical abuse by the father led to the prohibition against visitation, when actual physical abuse by the mother was not deemed to warrant such a restriction on her.

### (2) *Failure to cooperate.*

■■■ The trial judge also based his decision, in part, on the ground that the father "has not followed through with individual psychotherapy and domestic violence counseling," and that he "has not made any other efforts which would demonstrate a desire to visit respondents, such as completing parenting classes or addressing his substance abuse problem." The judge found that the father's lack of follow-through impeded the judge's efforts to evaluate the appropriateness of further visitation.

Under the legal standards that we have discussed in Part III B, *supra,* we question whether the father's deficient attendance, standing alone, would be sufficient to warrant a complete prohibition of visitation. As the judge pointed out during the hearing, visitation could have been arranged at the DHS office, and any threat of "domestic violence" against the respondents could thereby have been preempted.

In any event, the failure to hold an evidentiary hearing renders somewhat problematical the trial judge's reliance on the father's lack of cooperation. The father's attorney represented to the court, without contradiction, that the father's urine was found to be positive twice and negative thirty-one times; the last positive test was almost six months before the hearing. Through counsel, the father offered to provide a urine sample on the day of the hearing. In the absence of admissible evidence refuting the father's counsel's version, it is difficult to discern any basis for a categorical finding that the father failed to address his substance abuse problem.

The other evidence of non-cooperation to which the judge alluded was likewise inconclusive. The proffer by the father's attorney, see p. 300, *supra,* described some commendable efforts on the father's part. Moreover, the father was no longer a defendant in a domestic violence case, and this impaired his eligibility to participate in a domestic violence class at the Superior Court. There also appears to have been a misunderstanding as to whether the father was required to attend psychotherapy sessions in addition to meeting with the psychologist for an initial assessment.[15] In addition, although his attendance at parenting classes and NA/AA was less than perfect, he had at least begun to attend. Both the father and the mother missed appointments with the social worker, but denial of all visitation is a somewhat drastic remedy for imperfect compliance. It is noteworthy, in assessing what it was that the judge found to be most important, that the mother's attendance was no more regular that the father's, but that her visitation privileges were not withdrawn or reduced on that account.

It is important to recognize, in this connection, that according to the clinical psychologist who examined him, the father is a man with "limited intellectual functioning." His IQ was reported to be 76, plus or minus 5. Common sense tells us that individuals whose intellectual resources

---

**15.** The psychologist found the father to be "relaxed and cooperative, talking at length about a variety of topics, including his personal history, his work, his relationship with [the mother] and her family, and the allegations of sexual abuse."

are so impaired are rarely able to comply perfectly with programs devised for them by probation officers or social workers, especially where these programs require concentration on schedules and time tables for protracted periods of time. We cannot agree with the notion that the father's record of compliance—an imperfect record, but one that was not by any means "all bad"—warranted the denial, potentially forever, of any contact whatever with his sons.

It is true that the father's deficient attendance reduced in some measure the information about him immediately available to the judge. But if the representations by the father's attorney on the subject were accurate, then many of the relevant facts were already known, and the father was ready to cooperate by attending psychotherapy sessions and parenting classes. Indeed, but for the allegations of sexual abuse, we think it unlikely that visitation would have been completely forbidden.

(3) *The father's alleged lack of initiative.*

■■■ The respondents were removed from the mother's custody in December 1995. The father did not appear in court until September 1996. At the time the case was petitioned, the boys and their mother were living with their paternal grandfather. After the grandfather died, the mother and the children moved in with the mother's sister. The father apparently took no active steps to maintain his relationship with his sons until his attorney filed a motion for visitation in September 1996.

We do not believe, however, that the father's seeming lack of initiative during this period could warrant the entry of an order denying the father all contact with his sons. It is worth noting that, in the absence of an evidentiary hearing, the father never had the opportunity to testify, either about the alleged abuse or about his apparent passivity after the respondents were removed from the mother's home. In addition, as we have explained above, the father's intellectual resources were limited. The District government had alleged neglect of the respondents by the mother, but not by the father. The boys were with the children's maternal aunt, who was allegedly quite hostile to the father. With the respondents in apparently unfriendly hands, it is surely understandable, under all of the circumstances, that the father may not have known just what he could or should do next.

We have no doubt that the order prohibiting visitation was principally animated by the allegations of sexual abuse. This is evident from the face of the successive orders entered by the court. Without these allegations, it does not appear likely that the judge would have viewed the father's lack of initiative in late 1995 and much of 1996 as a basis for denying visitation.

(4) *The change of the goal from family reunification to adoption.*

■■■ In his written order, the judge found that visitation by the father was not in the respondents' best interest, in light, *inter alia,* of "the change of the goal to adoption." This is undoubtedly a legitimate factor in the visitation calculus, and the trial court should address it on remand. It is not at all clear, however, that reunification would have been abandoned at all if there had been no allegation of sexual abuse. We also note that the change in goal does not appear to have been a dispositive consideration, for continued visitation by the mother was not

prohibited.[16]

## IV.

### CONCLUSION

In sum, we are constrained to conclude that the judge's exercise of discretion lacked a firm factual predicate, and that the judge's action cannot be reconciled with the applicable legal standard.[17] Accordingly, the order of the trial court prohibiting visitation by the father is reversed. The case is remanded to the trial court for further proceedings consistent with this opinion. In light of the substantial lapse of time, it will of course be necessary for the trial court to update its findings so that they embrace all relevant events that may have happened while the case was on appeal.

*So ordered.*

---

**16.** The judge also referred in his order to then recent "reports from respondents' therapists stat[ing] that neither child is psychologically ready or willing to resume contact with the father." We have summarized the 1997 reports at pp. 302–03, *supra.* In the case of K.W., the social worker believed that eventual contact with the father would probably be "helpful." The report on Ko.W. was more guarded and, as we have noted, rather indirect in its approach. The psychologist who examined the father believed that "achieving visitation with his sons appears to be a realistic goal." All in all, the reports of the three therapists, two of whom appeared to favor visitation by the father, cannot fairly be described as supporting the view that such visitation would cause the respondents to suffer emotional injury.

In any event, we do not believe that a complete ban on visitation would have been imposed, on the basis of these reports, if the judge had concluded that the allegations of sexual abuse were baseless.

**17.** Although the judge did not misstate the legal standard, we find it difficult to square his disposition with the formidable burden imposed by the law on those who seek to deny a father all contact with his children, particularly where, as here, the father has not been found to have neglected the respondents or engaged in any wrongdoing.