who is recused, and Mr. KNIGHT and Mr. BAACH, who did not participate.

**In re T.L. and G.L.**

**G.B., Appellant.**

Nos. 03–FS–1093, 03–FS–1571.

District of Columbia Court of Appeals.

Argued Sept. 9, 2004.
Decided Oct. 14, 2004.

Alan Solomon, appointed by the court, for appellant.

Mary L. Wilson, Assistant Attorney General for the District of Columbia, with whom Robert J. Spagnoletti, Attorney General, and Edward E. Schwab, Deputy Attorney General, were on the brief, for appellee.

Before SCHWELB and RUIZ, Associate Judges, and NEBEKER, Senior Judge.

SCHWELB, Associate Judge:

Appellant G.B. is the biological mother of two boys, G.L., who was born on September 10, 1996, and T.L., born on October 1, 1997.[1] She appeals from an order of the trial court entered on August 6, 2003, barring further visitation by the mother with either child.[2] Because we are not satisfied that the trial judge's stated reasons for her order, standing alone, are sufficient to sustain the order, we remand the case to the trial court for further proceedings consistent with this opinion.

## I.

### THE TRIAL COURT PROCEEDINGS

On June 15, 1998, the boys, who had been living with both parents, were admitted to D.C. General Hospital as a result of undernourishment and "failure to thrive." They were subsequently placed in shelter care by order of the court. On July 28, 1999, the trial judge found that the children were neglected and committed them to the custody of the Department of Human Services (DHS), and the boys were placed in foster care. On November 17, 2000, the court ordered DHS "to pursue adoptive placement ASAP."

The mother initially agreed that the permanency goal for both children should be adoption. She acknowledged that she had not visited the boys regularly, that she had not participated in therapy, and that she had no viable place in which she and the children could live. On March 9, 2001, however, the mother's attorney filed a motion requesting, *inter alia*, that the permanent goal in the case be changed from adoption to eventual reunification. In his motion, counsel stated:

1. That the current goal of this case is adoption.

2. That at the time the goal became adoption, the respondents were with a caretaker that all parties thought desired to adopt the children.

3. That at the time the goal was made adoption, the mother and father were not visiting the children on a regular basis, were not actively participating in therapy, and did not have a viable place to live with the children.

4. That as of the date of this motion, the mother is employed, has been approved for section eight housing and has maintained regular contact with her children through visitation.

---

1. The mother also has two older children who live with their paternal grandmother and who are not involved in these appeals.

2. The boys' father was also a party to the neglect proceeding in the Superior Court, but he is not a party to these appeals.

5. That at this time there is no one ready, willing, and able to adopt these children. Long term preference should always be with a natural parent over a complete stranger.
6. That until the goal of the case is changed, CFSA[3] will search for an adoptive home which would disrupt the lives of the children if and when one is found. If the goal was changed, the children could remain in their current placement and gradually be reunified with their mother.

On April 26, 2001, notwithstanding the mother's change of heart, the trial judge reaffirmed that "permanency planning remains adoption," and she ordered DHS to expedite adoptive placement and to submit an *ex parte* report within 30 days. On July 1, 2003, after an earlier pre-adoptive placement had proved unsuccessful, the boys were placed in a second pre-adoptive home where, so far as we are aware, they continue to reside. We were advised at oral argument that a petition to adopt each boy is presently pending in the Superior Court.

Initially, both biological parents were permitted weekly supervised visitation with the boys, and it appears that a substantial bond was formed between the mother and her sons. In a report to the court dated March 8, 2002, a DHS social worker and her Program Director stated as follows:

The visits have been going well. Since the last court hearing, [the mother] has missed two consecutive visits and has been late for one visit. During the visits, she interacts with the children by playing with them, talking to them and reading to them. She is very good at redirecting [the boys'] behavior and set-

ting limits. She seems glad to see them and displays emotions openly by hugging and kissing them on the cheek. The children enjoy the visits and look forward to seeing their mother. They return [the mother's] affections. The case manager has observed that departing from their mother is getting more difficult for them and often ends in tears.

The next report, on April 23, 2002, was less glowing, but not altogether unfavorable; it was reported that the mother brought gifts to the boys and hugged them and that they "struggle[d] for her attention," but that she was easily distracted and that she sometimes disappointed her sons by being inattentive.

On April 25, 2003, the trial judge ordered that the mother's visitation be reduced to one visit per month, and she directed that the children's therapist, Chris Bazemore, LCPC, submit a recommendation as to future visitation. In his initial report, which he prepared in response to the judge's order, Mr. Bazemore apparently failed to address the issue of visitation at all.[4] Ultimately, on June 13, 2003, Bazemore submitted a brief "addendum" in which he stated that the boys' "anger and emotional outbursts ... increase[ ] after their mother's visitation session," that "[t]he children do not long to see their mother," and that "[t]he many false promises by their mother and pre[-]adoptive parent has [sic] impacted on [the boys'] ongoing schedule .... For the best interests of the children all visitation with [their] mother should cease."

In an order dated June 10, 2003, which she issued prior to receiving the therapist's addendum, the judge entered an order which provided, *inter alia*, that

---

3. This stands for Child and Family Services Agency.

4. Bazemore's initial report was not made a part of the record on appeal.

the parties shall ... have ten ... days to file any response to Mr. Bazemore's writing, including any requests for a visitation hearing.

No party filed such a response or requested a hearing. On August 6, 2003, the court issued an order which prohibited further visitation by the biological parents because

> 1. the goal is adoption with the biological parents, necessitating the strengthening of the bond with the pre-adoptive parents; [and] 2. the recommendation of Mr. Bazemore, the children's therapist, that visitation with [the] biological mother cease now.

On September 25, 2003, the mother filed a timely notice of appeal.

## II.

## LEGAL ANALYSIS

The mother contends that the grounds stated by the trial judge in her order of August 6, 2003, are insufficient, as a matter of law, to support a complete prohibition against visitation by her. In response, the District emphasizes that the children have been in care for most of their lives; that the mother has neglected them; that the mother has failed to utilize social services which have been offered to her in order to prepare her for possible reunification with her sons; that although the trial judge has patiently tried to work with the mother, the mother has made little or no progress in improving her par-

enting skills; that the judge has had extensive experience with this family over a period of years; and that under all of these circumstances, there has been no abuse of discretion. Although it may be that findings could fairly be made in this case which could support the court's order barring visitation, the two reasons stated by the judge in her written order are, in our view, insufficient to support such a drastic limitation on the mother's rights. Accordingly, we remand the case to the trial court for additional findings of fact and conclusions of law, and for disposition of the visitation issue consistent with this opinion.

### A. *Jurisdiction and standard of review.*

 Although, in a child neglect proceeding such as this one, an order denying a parent the right to visit his or her child does not finally conclude the litigation, we have held that such an order is appealable and that this court has jurisdiction of the appeal. *In re D.M.*, 771 A.2d 360, 370 (D.C.2001).[5] "The proper disposition of a neglected child, including the question whether a non-custodial parent should be granted visitation rights, is committed to the sound discretion of the trial court; the exercise of that discretion is reviewable only for abuse." *In re Ko.W.*, 774 A.2d 296, 303 (D.C.2001). Judicial discretion must be founded upon correct legal principles and must rest on a firm factual foundation. *Id.* (citations omitted).[6]

---

5. The District agrees that the August 6, 2003 order is appealable.

6. On the record before us, the District might reasonably have taken the position that the mother has effectively waived the claim that she is presenting on appeal, or at least that our review of the judge's order should be for plain error. There is nothing in the record to indicate that the claim of evidentiary insufficiency on which the appeals are based was

ever presented to the trial court. The mother did not avail herself of the opportunity, expressly offered to her by the judge, to respond to Mr. Bazemore's addendum or to request a hearing (presumably an evidentiary hearing) on the question of visitation. If Bazemore's submission and the question whether further visitation should be prohibited were discussed at all by court and counsel, the mother has failed to provide us with the transcript of any proceeding at which such a discussion may

## B. *The right to visitation.*

■ The right of a biological parent to raise his or her child is of constitutional dimension; it has been characterized as "essential" and as "far more precious than property rights." *Ko.W.,* 774 A.2d at 303–04 (quoting *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (internal quotation marks omitted)). A parent's liberty interest "does not evaporate simply because the [parent] ha[s] not been [a] model parent[ ] or ha[s] lost temporary custody of [her children] to the State." *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). In a neglect proceeding, a parent's right to custody "may not be overridden in the absence of persuasive evidence that the children's well-being requires that custody be placed elsewhere." *Ko.W,* 774 A.2d at 304.

■ For a parent who no longer has custody of her children, the complete prohibition against any visitation with them is even more severe than a denial of custody. *Id.* In *Ko.W.,* we recognized that

> a non-custodial parent has *"the right of visitation* with the children and ought not to be denied that right unless by his conduct he has forfeited his right, or unless the exercise of the right would injuriously affect the welfare of the children." *In re M.D.,* 602 A.2d 109, 112 (D.C.1992) (emphasis in original) (quot-

ing *Surrey v. Surrey,* 144 A.2d 421, 423 (D.C.1958)). Visitation should be permitted "unless the chancellor is convinced that [it would be] detrimental to the best interests of the infant." *Id.* (citations and internal quotation marks omitted). The applicable Superior Court rule is consistent with the case law, and provides that during the pendency of a neglect proceeding, the court should authorize visitation at least on a weekly basis unless such "at least weekly visitation would *create imminent danger or be detrimental to the well-being of the child."* Super. Ct. Neglect R. 14(b). *Id.* (emphasis added). In this case, with adoption proceedings pending, the prohibition against visitation has consequences essentially similar to those of a formal termination of parental rights; under the regime ordered by the court, the mother is likely never to see the children again. Moreover, the mother's ability to contest the prospective adoption and to maintain her relationship with her sons will be severely impaired if, at the time the decision as to adoption is made, she will have had no contact with her children for a protracted period of time.

■ In her order of August 6, 2003, the judge specified two reasons for denying all visitation: 1. that the final plan for the children was adoption, so that further visitation might interfere with the boys' bonding with the prospective parents; and 2.

---

have taken place. *See Cobb v. Standard Drug Co.,* 453 A.2d 110, 111 (D.C.1982) (appellant must provide a record sufficient to show that error occurred).

Nevertheless, the District does not assert that the mother has waived the issue, nor has the District suggested that we apply a "plain error" standard of review. On the contrary, the District has framed the question presented as "[w]hether the trial court abused its discretion in terminating the visitation rights of the biological mother with her two children ...." Thus, if there has been a waiver by the moth-

er, "the [District] has ... waived its waiver argument." *United States v. Delgado–Garcia,* 362 U.S.App.D.C. 512, 515, 374 F.3d 1337, 1340 (2004). Moreover, in a case of this kind, in which fundamental rights of the children and the mother are at issue, we are reluctant, unless compelled to do so by statute or binding precedent, to dispose of the appeal on technical grounds not related to the merits. *Cf. In re L.W.,* 613 A.2d 350, 353 n. 6 (D.C.1992) (citations omitted) ("technical defects will not be given primacy over the best interest of the respondent.")

that the boys' therapist had recommended that no further visitation be permitted. At oral argument, counsel for the District conceded that, standing alone, the first of these grounds—the choice of adoption as a goal—does not automatically warrant a ban on any visitation in the interim. We can take judicial notice of the fact that hopes and plans for adoption often fall through; indeed, this is what occurred with respect to the first prospective adoptive home in which the two boys were placed in this case. Moreover, children often remain in a "pre-adoptive" status for a very long time. Any rule that would automatically require a termination of all contact between a child and his or her biological parents once adoption has become the permanent plan would unnecessarily impair or even shatter the existing family relationship, and this damage would result even where, as in the present case, the boys have thoroughly enjoyed visits with their mother and have looked forward to them. In some cases, there may be special circumstances warranting a ban on further visitation after the court has determined that the appropriate solution for a particular child is adoption, but there can be no universal no-visitation rule.

The more difficult question is whether Mr. Bazemore's report, combined with the need for bonding between the children and the prospective adoptive parents, can support the complete prohibition against visitation imposed by the court. In Mr. Bazemore's view, further visitation should be prohibited in the best interests of the children. The opinion of the boys' therapist on this issue is uncontradicted in the record, a circumstance that necessarily gives us pause.

A review of Bazemore's submission to the court persuades us, however, that as written, it provides insufficient support for the trial judge's order in light of the stringent test for barring visitation articulated in *Ko.W.* and in the authorities there cited. The document is styled an "addendum," and its discussion of the visitation issue consists of a total of 12½ lines. The conclusory nature of the therapist's report does not comport with the seriousness of the subject, and its skimpy analysis is not commensurate with the profound effect that a ban on visitation may have on the lives of the boys and their mother. Bazemore concludes that the mother's monthly visits have been responsible for an increase in the boys' anger, fighting, and "inappropriate acting out with peers at school," but it is difficult not to wonder, in the absence of more elaboration, how the therapist arrived at his conclusion regarding cause and effect.

The statement in the report that "[t]he children *do not long* to see their mother," (emphasis added), raises more questions than it answers. The therapist does not reveal how he reached this conclusion, or whether he asked the boys or relied instead on his own subjective impression. More significantly, whether or not the boys *long, i.e.,* yearn, to see their mother is a critically different question from whether they *wish* to see her, but the boys' wishes or preferences as to visitation (either stated or inferred) are not addressed. Bazemore makes no mention of the earlier reports, quoted at p. 1089, *supra,* depicting a cordial and loving relationship between mother and sons. The addendum contains only minimal discussion of what has occurred during the mother's visits and no real analysis of the pros and cons of continued visitation. We therefore conclude that the judge's order cannot be sustained on the grounds stated or on the

basis of Bazemore's cryptic addendum.[7]

## C. *The remedy.*

Although the reasons stated by the judge in her order of August 6, 2003, standing alone, are insufficient, in our view, to sustain a "no visitation" order, we are not prepared to require the judge to reinstitute visitation immediately. Prior to issuing that order, the judge offered to hold a hearing (presumably with sworn testimony), with respect to the therapist's report and the general subject of visitation. The mother did not respond to this invitation. Had the mother contested the issue in the trial court, see note 6, *supra*, the judge might well have articulated more comprehensive and perhaps more persuasive reasons for her decision not to permit further visitation. Under the circumstances, we think it appropriate to remand the case to the trial judge for findings of fact and conclusions of law, and for an order consistent with the legal principles set forth in this opinion.

*So ordered.*[8]

---

**7.** According to Mr. Bazemore, the "many false promises by [the boys'] mother and pre[-]adoptive parent has [sic] impacted on [their] ongoing schedule (school, after care, foster home placement and in the community)." Any broken parental promises are, of course, matters of concern, but one is left to guess the precise meaning of this sentence. In addition, we think it illogical to bar visitation by the mother, even in part, because another person—one pre-adoptive parent—has allegedly made false promises to the children.

**8.** On remand, the judge is, of course, free to hold an evidentiary hearing (as, indeed, she previously had offered to do) if, in the judge's view, a hearing is necessary or appropriate in order to make the requisite findings. We emphasize that we do not fault the judge for not having held such a hearing when no party responded affirmatively to the judge's explicit offer to hold one. See note 6, *supra*. We are also confident that the judge will include in her findings on remand any relevant developments since she entered the August 6, 2003 order.