**BRANDYWINE APARTMENTS, LLC, Appellant,**

v.

**Willie McCASTER, Appellee.**

**Nos. 06–CV–1181, 07–CV–699.**

District of Columbia Court of Appeals.

Argued Nov. 5, 2008.
Decided Jan. 29, 2009.

---

Todd Kelting, for appellant.

William C. Johnson, Jr., Washington, for appellee.

Before RUIZ and FISHER, Associate Judges, and FARRELL,* Senior Judge.

FISHER, Associate Judge:

Having found violations of the District of Columbia Human Rights Act and the Con-

---

* Judge Farrell was an Associate Judge, Retired, of the court at the time of argument. His status changed to Senior Judge on January 23, 2009.

1. The Markswright Standards are guidelines that leasing agents of The Brandywine follow in reviewing applications. There is no evi-

sumer Protection Procedures Act, a jury awarded damages to appellee Willie McCaster. The court later awarded attorney fees to his counsel, and appellant challenges these judgments on appeal. We affirm in part and reverse in part.

## I. The Factual and Procedural Background

On August 23, 2003, appellee Willie McCaster and his common-law wife, Falicia Richmond, filed an application to rent an apartment in The Brandywine, a building located at 4545 Connecticut Avenue, N.W., and owned by Brandywine Apartments, LLC. Mr. McCaster testified that he wanted to rent the apartment so that he and his son could live there and his son could continue attending the elementary school located in the same district as The Brandywine. Although he intended that Ms. Richmond live with them, Mr. McCaster testified that he would have rented the apartment even if she had not been allowed to occupy the premises.

The Brandywine's policy required that each adult who intended to live in an apartment fill out an application and submit to a credit check and a criminal record check, so appellee and Ms. Richmond submitted separate applications. The Brandywine used the Markswright Qualification Standards,[1] "criteria for qualifying prospective residents," which state, in relevant part:

> If, in the screening process, the inclusion of a person causes the application to be denied on the basis of credit information, you may withdraw that person

dence that they were ever shown to Mr. McCaster, Ms. Richmond, or any other applicant, single or married. "Markswright" refers to Markswright Management, the company for which Mrs. Chandra Marks, the "representing managing agent" of The Brandywine, worked.

from the screening process and proceed with the rest of the applicants and/or occupants. Applicants and occupants denied on the basis of criminal background check shall not be allowed to occupy the premises.

Mrs. Chandra Marks, the "representing managing agent" of The Brandywine, testified that this guideline meant that if two persons applied to live in the same apartment, and one of them was unable to pass the background check, the other person would be able to proceed with his or her own application to live in the apartment without the unacceptable person. When persons applied to live in the same apartment, "[t]heir whole process is handled in one step-by-step fashion together," and she treated Mr. McCaster and Ms. Richmond as having jointly applied.

At the start of the application process, The Brandywine ran a credit check on both Mr. McCaster and Ms. Richmond; Mr. McCaster's credit was approved, but Ms. Richmond's credit precluded her from proceeding with the application unless she provided a co-signer.[2] Mrs. Marks stated that she spoke with Ms. Richmond's mother, who agreed to co-sign on behalf of her daughter. Mrs. Marks testified that she never received the co-signed application; however, the lack of a co-signer became irrelevant when, on August 27, 2006, Mrs. Marks received the results of the criminal background check showing that Ms. Richmond had twice been arrested for misdemeanors.[3] On this basis, Ms. Richmond's application was immediately denied.[4] Mrs. Marks testified that the applications of Mr. McCaster and Ms. Richmond were "for all intents and purposes . . . one application," and therefore Mr. McCaster's application was denied concurrently with Ms. Richmond's.

When asked by appellee's counsel whether it is "permissible for an accepted husband to get an apartment when his wife was unaccepted," Mrs. Marks first responded that she did not know because "[t]hat situation hasn't happened to me." She clarified that she had never encountered a husband who sought to rent an apartment in The Brandywine, knowing that his wife would be precluded from living there. Nevertheless, Mrs. Marks stated that appellee would have been allowed to withdraw his wife from his application. Appellee never informed The Brandywine that he was interested in renting the apartment without Ms. Richmond; nor was he expressly informed of that option.

Appellee asserted that The Brandywine never told him why his application was rejected, and that he hired an attorney after he had been unable to get in touch with the management to find out any information. However, Mrs. Marks testified that on August 27, 2006, she told both Ms. Richmond and Mr. McCaster, in separate

---

**2.** Mrs. Marks explained that, according to uniform standards, Mr. McCaster's credit was "too thin" to cover all of the rent.

**3.** Mrs. Marks testified that the application was denied based solely on Ms. Richmond's criminal record, and not because of her lack of credit. Appellee attempted to impeach Mrs. Marks with her sworn affidavit, where she claimed that she had received the results of Ms. Richmond's background check on August 26, 2006, and denied the application then. Mrs. Marks acknowledged that she did not receive the background check until August 27. She explained that the date in the affidavit was a mistake and that the application was actually denied on August 27, after she became aware of Ms. Richmond's arrests.

**4.** Appellee conceded in the trial court that The Brandywine had "the right to decide, based on her record," if Ms. Richmond should be allowed to live in the building. He reiterated this concession at oral argument before us.

phone calls, why the application had been denied. "I told him that the application was denied because of Ms. Richmond's criminal background." Appellee said that he would have his attorney call her. Later that afternoon, the attorney called and Mrs. Marks "told him that they were denied because of [Ms. Richmond's] background."

Appellee testified that he found the experience of being rejected from The Brandywine "stressful," because he was concerned about maintaining his son's placement in the local school. On redirect examination, he added that The Brandywine's alleged failure to respond to his inquiries regarding the reason for the denial was "humiliating" and "upsetting." He presented no evidence of economic damage.

The jury found that The Brandywine had violated the District of Columbia Human Rights Act (DCHRA) by "terminat[ing], refus[ing], or fail[ing] to initiate or conduct a real property transaction with plaintiff on the basis of plaintiff's marital status" and by "impos[ing] conditions not imposed on non-married applicants on the basis of plaintiff's marital status." The jury also found that the appellant had violated the District of Columbia Consumer Protection Procedures Act (CPPA) by "fail[ing] to state a material fact to plaintiff [which failure] tended to mislead plaintiff." It awarded $20,000 in compensatory damages for the DCHRA violation, and $2,500 in damages for the CPPA violation.

Following the verdict, appellee's attorney sought compensation under the DCHRA and the CPPA, both of which authorize the court to award reasonable attorney fees if the plaintiff's attorney wins his case. *See Lively v. Flexible Packaging Ass'n*, 930 A.2d 984, 989 n. 6 (D.C.2007) ("The entitlement to attorneys' fees under the D.C. Human Rights Act

derives from D.C.Code § 2–1403.13(a)(1)(E) (2001)."); D.C.Code § 28–3905(k)(1) (CPPA provision authorizing recovery of "reasonable attorney's fees."). Appellee's counsel, Mr. Johnson, presented time sheets and testified about the hours he spent working on appellee's case, but the court found his records to be "on their face, unreasonable" and "completely inaccurate," and "d[id not] credit [his] testimony." However, "based upon [a] review of the pleadings [and] ... the docket," the trial court decided "what would be a reasonable amount of time to spend on [ ] this case" and awarded Mr. Johnson $9,000 in attorney fees for his victory on the DCHRA claim, and $4,500 for the CPPA claim.

## II. Standard of Review

"It is only in the unusual case, in which only one conclusion could reasonably be drawn from the evidence, that the court may properly grant judgment notwithstanding the verdict." *Homan v. Goyal*, 711 A.2d 812, 817 (D.C.1998) (internal editing and citation omitted). Nevertheless, "a court should render judgment as a matter of law when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 149, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting Fed. R.Civ.P. 50(a)); *accord, Washington Convention Center Authority v. Johnson*, 953 A.2d 1064, 1072 (D.C.2008) ("Judgment as a matter of law must be granted if, viewing the evidence in the light most favorable to the non-moving party, there is no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party." (internal quotation marks and citation omitted)).

## III.  The Human Rights Act Claim

### A.  May We Consider the Sufficiency Issue?

■ Appellant challenges the DCHRA judgment on two principal grounds: (1) that Mr. McCaster failed to prove that he was discriminated against—treated differently—because The Brandywine perceived him to be married, and (2) that there was insufficient evidence of any damages resulting from the alleged discrimination. In its motions for judgment, however, appellant did not raise the lack of evidence of discrimination.[5] We have said that "[u]nless a party fairly apprises the trial court of the theory advanced or question presented with some precision, such questions will generally be spurned on appeal." *Mitchell v. District of Columbia,* 741 A.2d 1049, 1052 (D.C.1999). The purpose of this requirement "is to call the attention of the opposing party to the alleged deficiency in the evidence at a point in the trial where that party may cure the defect by presentation of further evidence." *NCRIC, Inc. v. Columbia Hosp. for Women Medical Center, Inc.,* 957 A.2d 890, 904 (D.C.2008) (internal citations omitted).

However, appellee has not argued on appeal that this claim should be rejected because it was not preserved. He therefore arguably has waived any procedural objection. *See, e.g., In re T.L.,* 859 A.2d 1087, 1090–91 n. 6 (D.C.2004) (approving "waiver of the waiver" analysis); *United States v. Delgado–Garcia,* 362 U.S.App. D.C. 512, 515, 374 F.3d 1337, 1340 (2004) (same); *see also Wilson–Bey v. United States,* 871 A.2d 1155, 1156–57 n. 4 (D.C. 2005) (holding that decision whether to apply "waiver of the waiver" analysis "is a

discretionary one for the appellate court"), *rev'd on other grounds,* 903 A.2d 818 (D.C. 2006) (en banc).[6] Although we rarely exercise our discretion in this manner, we have done so previously where we have found that it would be unjust to "dispose of the appeal on technical grounds not related to the merits." *In re T.L.,* 859 A.2d at 1090–91 n. 6 (finding the case appropriate for applying "waiver of the waiver" doctrine because "fundamental rights of the children and the mother [were] at issue").

It seems clear from the manner in which appellee presented his case and has argued this appeal, that he was not prejudiced by the lack of an objection because he had no other evidence of discrimination to present. Moreover, upholding a judgment in favor of appellee, unsupported as it is by any evidence of intentional discrimination, would distort the meaning and purpose of the DCHRA. *See* D.C.Code § 2–1402.21(a) (2001) (making it illegal to refuse to engage in a real estate transaction, or to create additional terms in such a transaction "for a *discriminatory reason* ") (emphasis added). We therefore exercise our discretion to consider the merits of appellant's argument that the evidence failed to prove discrimination.

### B.  Proof of Discriminatory Animus Is Required

■ To establish a claim of *intentional* discrimination—the theory of liability in this case—the plaintiff must prove intentional and purposeful conduct based on his membership in a protected class. *See McFarland v. George Washington University,* 935 A.2d 337, 346 (D.C.2007) (to carry his burden, plaintiff must at least "rais[e] an inference of *purposeful* discrimination")

---

5. In both of its motions for judgment, appellant argued only that Mr. McCaster had failed to prove that he was married and that he had failed to show damages.

6. Appellant has not challenged the adequacy of the evidence to establish a violation of the CPPA; we therefore do not review that judgment.

(emphasis added);[7] *Reeves*, 530 U.S. at 141, 120 S.Ct. 2097 (question of whether defendant is guilty of discrimination "depends on whether the protected trait ... actually motivated [the defendant's] decision") (internal citation omitted). "Recognizing that the question facing triers of fact in discrimination cases is both sensitive and difficult, and that [t]here will seldom be 'eyewitness' testimony as to the employer's mental processes," *id.,* we sometimes allow discriminatory intent to be inferred from disparate treatment. *See International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) ("Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment."). However, where the plaintiff has produced no direct or circumstantial evidence of discriminatory animus, a judgment in his favor cannot stand. *See Futrell v. Dep't of Labor Federal Credit Union,* 816 A.2d 793, 802 n. 11 (D.C.2003) (upholding grant of summary judgment because "the appellant failed to offer evidence of either disparate treatment or discrimination").

Appellee argues that a violation of the DCHRA was proven by Mrs. Marks' testimony that the applications of married people are handled jointly, whereas the applications of unmarried people are independent of each other. This is not a fair characterization of her testimony, however. Although the manner in which appellee's counsel posed his questions created a great deal of confusion, when read in context, Mrs. Marks' testimony compels the conclusion that no discrimination took place. She testified that when people applied for an apartment together, whether they were married or not, they were treated as joint applicants. "[T]he policy is the same for anyone." "[A] joint application is the application of two persons at the same time for the same unit," with no distinction made between married and unmarried persons.

Mr. McCaster and Ms. Richmond applied to live together in the same apartment. Mrs. Marks testified that "[t]hey came as a couple. They both put children on their applications." Ms. Richmond submitted an application listing herself, Mr. McCaster, and their children as the intended occupants of the unit. Both parties agreed to a credit check and a criminal background check and signed all requisite forms—acts that only prospective applicants are required to take. There was no evidence that Mr. McCaster ever made The Brandywine aware that he was interested in renting the apartment by himself; on the contrary, the evidence clearly shows that Mr. McCaster and Ms. Richmond presented themselves to The Brandywine as a family intending to occupy the unit together. Mrs. Marks stated: "I never separated him in my mind. They came as a family. They applied as a family. That's the whole application in my mind."

Furthermore, Mrs. Marks testified that *had* Mr. McCaster expressed an interest in renting the apartment without Ms. Richmond, he would have been allowed to apply on his own. Appellees did not present any evidence to contradict that testimony. Appellee urges us to hold that The Brandywine violated the DCHRA simply by

---

**7.** This case does not involve application of the "effects clause" of the DCHRA, D.C.Code § 2–1402.68 (2001). We have said that "[u]nder that section, despite the absence of any intention to discriminate, practices are unlawful if they bear disproportionately on a protected class and are not independently justified for some nondiscriminatory reason." *Gay Rights Coalition of Georgetown University Law Center v. Georgetown University,* 536 A.2d 1, 29 (D.C.1987) (en banc).

failing to notify Mr. McCaster that he would be allowed to proceed with his application if he wanted to live there without Ms. Richmond. However, appellee presented no direct evidence that this failure was motivated by discriminatory intent. Moreover, he offered no evidence of disparate treatment—there was no evidence that The Brandywine notified any other applicants, single or married, of this option. While we generally defer to a jury's verdict, we will not let it stand if there is absolutely no evidence to support it.

Because the appellee failed to provide any evidence that The Brandywine violated the DCHRA by discriminating against him based on marital status, we reverse the judgment. We therefore do not need to address any of appellant's other assignments of error attacking that judgment.

## IV. Damages for the CPPA Violation

■ Appellant argues that the jury improperly awarded Mr. McCaster $2,500 in statutory damages under the CPPA although there is a cap of $1,500. D.C.Code § 28–3905(k)(1)(A) (plaintiff suing a merchant for an unfair trade practices violation may recover "treble damages, or $1,500 per violation, whichever is greater").[8] We agree that the award of $2,500 is not authorized by the statute. There was no evidence allowing us to treat it as an award of treble damages. Because the only remaining option is the statutory minimum award, the amount of damages must be reduced to $1,500.

8. Because the CPPA allows treble damages, appellee argues that rather than being decreased to $1,500, his award should be increased to $60,000 (triple the award for the DCHRA violation). Appellee did not file a cross-appeal, however, and we therefore do not address his contention. *See Stutsman v. Kaiser Foundation Health Plan of Mid–Atlantic States, Inc.*, 546 A.2d 367, 370 (D.C.1988)

## V. Attorney Fees

■ Both the DCHRA and the CPPA allow the court to award a successful plaintiff attorney fees. See page 166, *supra.* "Our scope of review ... is a limited one because disposition of such motions [for attorney fees] is firmly committed to the informed discretion of the trial court. Therefore, it requires a very strong showing of abuse of discretion to set aside the decision of the trial court." *Lively*, 930 A.2d at 988 (internal citations and quotation marks omitted).

Appellant argues, as he did below, that the trial court should not have awarded any attorney fees at all—that to do so rewards Mr. Johnson's "dishonest" testimony and "inaccurate" record-keeping by giving him the same amount of attorney fees he would have received had he kept accurate records. The court specifically considered and rejected this contention, and we find no abuse of discretion.

Moreover, the trial court approached the issue of attorney fees in a careful manner. Although it found that Mr. Johnson's time records were "inaccurate" and "inflated," it studied the record and "ma[de] the decision [it]self based on what would be a reasonable amount of time to spend on [ ] this case." The court found that "Mr. Johnson was successful on two out of three claims under the [DCHRA] and ... one out of four claims under the [CPPA]," and that a reasonable amount of time to have spent on these claims was thirty-six hours. It then applied the Laffey Matrix [9] to find

("The well-settled rule of practice is that on an adversary's appeal a party may not challenge or seek to enlarge a judgment to which he himself did not object.") (internal citations omitted). Moreover, the DCHRA judgment must be vacated, so there are no damages to multiply.

9. The Laffey Matrix is explained in *Lively*, 930 A.2d at 988–91.

the appropriate hourly rate, and apportioned attorney fees in the following way: $9,000 for Mr. Johnson's success on the DCHRA claims and $4,500 for the CPPA claim.

Because we are reversing the DCHRA judgment, however, we also reverse the corresponding grant of attorney fees. *See* DCHRA, D.C.Code § 2–1403.13(a)(1) (plaintiff may only receive attorney fees if he proved that defendant "engaged in an unlawful discriminatory practice or has otherwise violated the provisions of this chapter"). We leave intact the $4,500 in attorney fees awarded for Mr. Johnson's success in prosecuting the CPPA claim, because appellant has not challenged that judgment on appeal.

## VI.  Conclusion

Because the finding of a DCHRA violation is not supported by the evidence, we reverse the judgment for Mr. McCaster, as well as the related award of attorney fees, and remand with instructions to enter judgment for appellant. We affirm the award of attorney fees apportioned to the CPPA judgment, but remand with instructions to reduce the amount of damages to $1500.

*So ordered.*