*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 16-FS-899, 17-FS-1250 & 18-FS-578

IN RE K.C.;
D.C., APPELLANT.

Appeals from the Superior Court
of the District of Columbia
(NEG-84-15)

(Hon. Janet Albert, Magistrate Judge)
(Hon. John F. McCabe & Hon. Julie H. Becker, Reviewing Judges)

(Submitted September 18, 2018    Decided January 31, 2019)

(Amended February 7, 2019)[*]

*Jennifer A. Renton* was on the brief for appellant D.C.

*Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General, *Caroline S. Van Zile*, Deputy Solicitor General, and *Pamela Soncini*, Assistant Attorney General, were on the brief for appellee the District of Columbia.

*Allison Federoff*, guardian ad litem, Melissa Colangelo, and Abraham Sisson, Children's Law Center, were on the brief for appellee K.C.

---

[*]   This opinion is amended to correct typographical errors by changing "K.C." to "D.C" in the antepenultimate and ultimate sentences immediately preceding the heading "II. Review of Suspension of Visitation," and by changing "13" to "18" in said ultimate sentence.

Before BLACKBURNE-RIGSBY, *Chief Judge*, GLICKMAN, *Associate Judge*, and WASHINGTON, *Senior Judge*.

WASHINGTON, *Senior Judge*: Appellant D.C., the biological mother of minor child K.C., seeks review of orders suspending her visitation with K.C. (Case No. 16-FS-899), changing K.C.'s permanency goal to adoption (Case No. 17-FS-1250), and terminating her parental rights (Case No. 18-FS-578).[1] These appeals were consolidated and, pursuant to D.C.'s unopposed motion, were submitted without oral argument. For the reasons that follow, we affirm the orders.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Because these cases come to us after three years of extensive and intertwined factual developments and court proceedings, we set out the factual background and procedural posture in some detail.

### A. Removal from the Home

---

[1] K.C.'s biological father, M.T., had limited, inconsistent visitation with K.C. during the pendency of these cases. He appeared through counsel during the proceedings in the trial court, but did not challenge the permanency goal change to adoption or the termination of his parental rights, and he has not appealed to this court. Therefore, we do not discuss him.

On January 7, 2015, the District of Columbia Child and Family Services Agency ("CFSA" or "the Agency") received a call on its child abuse and neglect hotline regarding K.C., who was seven years old at the time. The caller alleged that K.C.'s mother, D.C., had serious mental health issues that were interfering with K.C.'s educational needs, as D.C. had enrolled and withdrawn K.C. in twelve schools, though he was only in second grade, and noted that K.C. could not read. CFSA opened a Family Assessment case, then converted the case to a Child Protective Services Investigation four days later upon learning that D.C. had just transferred K.C. to another school again.

Over the next few weeks, Katie Grodin, an Agency social worker, met with K.C. at school twice, with D.C. several times, including at her home, and with staff at two of the schools that K.C. had attended. She also reviewed school records and consulted with a CFSA medical abuse/special needs liaison. D.C. appeared to be paranoid and delusional, as she believed, without any evidence, that her son was being mentally and physically abused at school, and, as a result, repeatedly moved him between schools. It also became apparent that K.C. was significantly academically and developmentally delayed, as he had missed significant periods of schooling as a result of the many school changes he had experienced – by Grodin's count, a total of sixteen placements, including public schools, charter schools, and

homeschooling options.

On March 10, 2015, CFSA received a report that K.C. had gotten into a fight with another student outside of a supermarket near the school, and that, when the students' parents and the police met at the school to discuss the incident, D.C. accused the principal of attacking her with a sword. Grodin again interviewed D.C. at her home the next day, where D.C. made further allegations against various school officials, including that they were falsely imprisoning and bribing K.C. Two days later, another CFSA social worker met with K.C. at home, though she had to interview him in front of D.C., as D.C. would not allow him out of her presence.

On March 16, CFSA removed K.C. from D.C.'s home and placed him in foster care. Agency staff completed a Child Abuse and Neglect Complaint and Referral Form the same day, and, on March 18, submitted a petition to open a neglect case in Superior Court.

On March 18 and 19, Magistrate Judge Janet Albert held an initial hearing and issued orders. The court granted D.C. weekly visitation with K.C., to be supervised by CFSA staff, with the conditions that D.C. was not to discuss the case

with K.C., and D.C. was not to visit K.C.'s school except for arranged meetings or in the company of a social worker. The court also ordered D.C. to submit to drug testing, to have psychiatric and psychological evaluations done at the Department of Behavioral Health Assessment ("DBH") Center, and to follow the recommendations of the evaluations. Shortly thereafter, on the motion of K.C.'s guardian ad litem ("GAL"), the court issued an order on April 21 appointing a surrogate parent for educational purposes, who could make educational decisions for K.C.

The court likewise ordered psycho-educational and speech and language evaluations for K.C., and ordered that he follow the recommendations of the evaluations. The initial evaluation showed that K.C. had significant academic, social, and emotional deficits, including specific learning disorder with impairment in reading, adjustment disorder with mixed disturbance of emotions and conduct, and low average IQ, including low and very low scores on cognitive functioning and achievement functioning tests. The evaluation also identified strengths and potential areas of growth, and recommended several services and interventions for K.C. At some point, K.C. was also diagnosed with Attention Deficit Hyperactivity Disorder and oppositional defiant disorder, which was consistent with the fact that he was considered a bully at school and had displayed aggressive behaviors toward

others on several occasions.

On June 11, 2015, D.C. entered a stipulation that K.C. was a neglected child, due to being left without proper education required by law. On June 19, Magistrate Judge Albert held a disposition hearing, at which she found that the Agency had made reasonable efforts to allow K.C. to return safely home, but that returning home at that time would be contrary to K.C.'s best interests. She set a permanency goal of reunification, meaning that CFSA was required to work to reunify K.C. with D.C., with the goal date set as May 15, 2016. The hearing order did not indicate that a CFSA case plan had been filed or attached, but specified:

> The Mother shall participate in the following services in order to be considered for reunification with [K.C.]:
>
> Individual Therapy and related services recommended by the provider;
> Psychiatric consultation for possible medication;
> Parenting Classes;
> Medical examination to include a neurological assessment;
> Allow the social worker to conduct a home assessment;
> Attend educational and medical appointments for [K.C.].

In addition to issuing the written order, the magistrate judge addressed D.C. orally in court, advising her of these requirements. The June 19 order also reiterated and expanded upon the conditions for D.C.'s supervised visitation with K.C., stating

that D.C. was not to discuss the case with K.C., make disparaging remarks about any party (including the foster parent, school staff, or social workers), or whisper to K.C. during the visits.

Following the June 19, 2015 disposition hearing, the court conducted periodic review hearings in the neglect matter, including on September 29, 2015, January 7, 2016, March 17, 2016, May 19, 2016, November 1, 2016, and April 13, 2017. D.C. was present at these hearings, and the magistrate judge informed her orally and in writing of the steps that she was required to take toward reunification.

## B. The Plan for Reunification

In the months after K.C. was removed from the home, the Agency attempted to work with D.C. on a plan to reunify her with K.C., pursuant to the March 19 and June 19 orders. However, D.C. was resistant to engaging with the Agency on the plan. Mary Gordon, the CFSA social worker assigned to the case from the initial hearing in March of 2015, consistently attempted to discuss with D.C. what was required of her and what services she should be receiving, but D.C. refused to review the case plan that Gordon presented to her or to meet with Gordon to discuss the plan. At one point, D.C. even refused to give Gordon her phone

number.  Still, Gordon communicated the plan requirements to D.C.'s attorney and, because she was supervising D.C.'s visitation with K.C., used the visits to remind D.C. of the requirements.  Both Gordon and Tania Abdulahad, the CFSA social worker who took over the case from Gordon in April of 2016, discussed court-ordered services with D.C. on many occasions.

D.C. did have psychiatric and psychological evaluations done at the DBH Assessment Center in May of 2015, which resulted in her being diagnosed with delusional disorder and child neglect by a DBH psychiatrist and psychologist.  However, while both evaluations recommended that D.C. engage in weekly individual therapy sessions, and while the court had specifically ordered D.C. to follow the recommendations of the evaluations, D.C. appeared to refuse therapy, asserting that she did not need mental health assistance.

For example, on somewhere between five and twelve occasions, Gordon attempted to provide D.C. with the information for the Access Helpline, a CFSA service that connects individuals with mental health service providers, but D.C. refused to accept it, alleging that any services associated with CFSA would be

biased against her.[2] Gordon also tried to discuss mental health services with D.C. several times, but she would always refuse. Several months later, Gordon discovered that D.C. had, in fact, been seeing her own personal therapist, Dr. James Ballard. However, when Gordon attempted to speak with him, D.C. would not waive her physician-patient privilege, so Gordon was initially unable to determine what services Dr. Ballard was providing and how the treatment was progressing. After the court issued an order waiving the privilege on December 31, 2015, and after making several attempts to contact him, Gordon finally spoke with Dr. Ballard in April of 2016. Based on what he shared with her, Gordon expressed her concerns to Dr. Ballard that he was not treating D.C.'s underlying mental health issues related to the neglect case, as he was treating her based solely on her self-reported situation[3] – without any attempt to review outside information,

---

[2] Due to privacy laws, Gordon could not call the Access Helpline on D.C.'s behalf; D.C. would have had to call on her own.

[3] Dr. Ballard's evaluation of D.C. states that she has "Adjustment Disorder with mixed anxiety and depression secondary to feelings of stress and frustration re [sic] actions toward her son, [K.C.]," and that she "does not meet the criteria for delusional diagnosis." It recommends individual therapy to help her "work through legal and educational problems," as well as "legal consultation" for her and "psychological evaluation" for K.C. to determine how he is reacting to "the way his life has been reconfigured," presumably meaning removal from the home and placement in foster care. The evaluation appears to adopt D.C.'s version of events, for instance stating that K.C. was removed from her home because she complained about him being physically accosted by someone at school.

verify facts, or address her deficits, despite her diagnosis of delusional disorder. Gordon then provided Dr. Ballard with relevant information in an attempt to persuade him to change his approach, but he was unwilling to do so. Gordon then recommended to D.C. that she switch therapists, but D.C. refused. At some point later in 2016, D.C. did connect with Contemporary Family Services, another service provider, for mental health treatment, but, as with Dr. Ballard, she did not disclose the nature or scope of her situation, and the staff there were not made aware of D.C.'s involvement with CFSA until months later, just before a court hearing in 2017 at which a Contemporary Family Services employee was called to testify by D.C.

D.C. completed a neurological evaluation and a home assessment, and she also took parenting classes. She likewise attended some educational meetings and medical and dental appointments for K.C. However, she refused to attend an educational meeting regarding K.C.'s individualized education plan, turning away from Gordon when Gordon attempted to hand her a letter about it, and, at an educational meeting that D.C. did attend, she refused to acknowledge K.C.'s educational needs and insisted that he could read and did not need remedial assistance. Moreover, she was disruptive during the medical and dental appointments she attended, including by banging on a door, taking a threatening

tone with providers, and stating repeatedly that K.C. was being abused by school staff, such that CFSA staff eventually informed her that she would no long be permitted to attend certain appointments.

D.C.'s visitation with K.C. was also tense. From March of 2015 on, K.C. remained in foster care and had weekly visits with D.C. For the first year, those visits were supervised by Gordon. Although K.C. was initially hesitant to see his mother and uncomfortable with the visits, the Agency made efforts to continue the visitation. Gordon eased K.C. into the visits by initially making them quite short and then increasing them to one hour. Gordon developed a signal with K.C. – a tap on the nose – that he could use to indicate when he wanted the visit to end early, and he did this at least twice toward the beginning of visitation. D.C. resisted allowing Gordon into her home for the visits, despite the court order allowing the Agency access to the home. For that reason, the visits often took place at a playground near the CFSA building, or, at D.C.'s request, in the lobby of the CFSA building.

While K.C. gradually adjusted to the visits, they became increasingly difficult and problematic over time due to D.C.'s disruptive behavior. More specifically, D.C. would interrogate K.C. regarding whether anyone at school had

hurt him, videotape him and state that he was being abused at school, disparage Gordon and the Agency to K.C., accuse the foster family of not feeding K.C. (including in front of other people in the CFSA lobby), whisper to K.C. in contravention of the court's order, and behave in a verbally and physically aggressive way toward Gordon. In one instance, D.C. showed K.C. pictures of several school staff on her phone and asked him to identify anyone who had abused him. During another visit, when K.C. told D.C. that he had a black eye as a result of getting into a fight with another child at school, D.C. insisted that the vice principal at the school had hit him and she made a child abuse hotline report about it. On yet another occasion, D.C. told K.C. to hit anyone who touches him, including Gordon and his foster mother. D.C. also shouted at Gordon and lurched toward her, and, during a visit with D.C. at which her adult son was present, D.C. and the adult son apparently pressured K.C. to falsely accuse his foster mother of mistreating him by forcing him to wash her feet and clean her room. Gordon consistently instructed D.C. to stop engaging in these behaviors, and the court repeatedly ordered D.C. not to engage in these behaviors at the review hearings, but she continued to do so. Gordon eventually scheduled a meeting with her supervisor, D.C., D.C.'s lawyer, and the government attorney to discuss D.C.'s inappropriate behavior during the visits. Gordon noted some improvement in D.C.'s conduct after the meeting, but her inappropriate behavior continued.

Initially, K.C. appeared to be adjusting well to foster care and responding well to play therapy. However, as the visits with D.C. grew more difficult over the ensuing months, K.C.'s behavior in his foster home and at school worsened considerably, and he began skipping school and displaying aggressive behavior toward other students, school staff, his therapist, and his foster family. In April of 2016, the night after the visit in which D.C. and her adult son pressured K.C. to falsely accuse his foster mother of mistreatment, K.C. tried to choke his foster brother before running out of the house at night. He was found by the police, and was then psychiatrically hospitalized at Children's National Medical Center. Following a visit from his mother while he was in the hospital, K.C. again lashed out, becoming aggressive toward hospital staff and ripping a door off its hinges.

### C. Suspension of Visitation

As a result of D.C.'s behavior immediately prior to and during K.C.'s psychiatric hospitalization, as well as its effect on K.C., on April 4, 2016, the government, representing the Agency, and supported by K.C.'s GAL, moved for temporary suspension of visitation. On April 11, the GAL also moved to appoint K.C.'s foster mother as his medical decision-maker. Magistrate Judge Albert held

an emergency hearing on visitation and, on April 12, issued an order temporarily suspending D.C.'s visitation, and set dates for a hearing on visitation and permanency. After the temporary order was issued, but before the hearing was held, K.C. was psychiatrically hospitalized again, during which time the government moved for an emergency order authorizing the administration of medication to K.C., as D.C. refused to allow K.C. to be medicated while at the hospital. The magistrate judge issued the order on April 29.

Magistrate Judge Albert conducted a full evidentiary hearing regarding visitation on May 11, 16, and 19, 2016. The magistrate judge heard testimony from Tiffanie Coates, K.C.'s play therapist at the time; Gordon, the CFSA social worker on the case from the time of K.C.'s removal until April 29, 2016; and Tania Abdulahad, the CFSA social worker who took over from Gordon and was the social worker on the case at the time, all of whom testified on behalf of the government. She also heard testimony from Dr. James Ballard, D.C.'s psychologist; Daryl Lashley, a CFSA family support worker who had assisted Gordon by supervising about a dozen visits between K.C. and D.C.; and D.C. herself, all of whom testified on behalf of D.C.

On May 23, 2016, the magistrate judge issued an order suspending

visitation. In assessing the credibility of the witnesses at the hearing, she found Gordon's testimony to be the most compelling and credible. She also credited Coates' and Abdulahad's testimony, and, while she credited Lashley's testimony, she found it to be of limited relevance, given the limited number of visits he supervised and the fact that he did so in a more observational role, without much interaction with D.C. or K.C. By contrast, the court found Dr. Ballard's testimony to be "utterly lacking in credibility," given that he had never seen D.C. and K.C. together, had in fact never met K.C., and had never attempted to verify information provided to him by D.C. using collateral sources, which the court found "curious," given D.C.'s delusional diagnosis.

The magistrate judge then made specific and detailed findings of fact regarding what had transpired during one year of visitation, reflecting the developments discussed above. The court also found that D.C.'s behavior had a negative effect on K.C., and that, as a result of the visits, K.C. became less communicative and more disrespectful and aggressive. The magistrate judge took note of the play therapist's professional opinion regarding the effect that behaviors like D.C.'s could have on a child, including encouraging the child to tell lies, disrespect authority, and manipulate people. Based on these findings, the court concluded that D.C.'s behavior was "emotionally damaging and confusing" for

K.C., and that visits were "very detrimental" to him, as evidenced by his recent "out of control behavior" following visits by his mother. Thus, continuation of visits at that time would not be in K.C.'s best interests. The court ordered that visitation be suspended until further notice – with the specific caveat that the Agency, the GAL, and K.C.'s therapist must revisit the issue quarterly to determine if visitation would no longer be detrimental and could be reinstated. It also issued an order on May 20 appointing K.C.'s then-foster mother as his medical decision-maker.

D.C. then filed a motion for review by an associate judge of the Superior Court, requesting review of the May 23 order suspending visitation. There is no indication that D.C. attempted, while the motion was pending, to make a showing to the Agency that visits would no longer be harmful to K.C., or to request that the Agency move the Court to reinstate visitation. And, while the treatment team in fact assessed the visitation issue monthly, it determined that D.C.'s visits would still be detrimental to K.C., and did not decide to reinstate visits. Therefore, her visits never resumed.

On August 4, Associate Judge John McCabe affirmed the May 23 order, concluding that "Magistrate Judge Albert conducted a thorough evidentiary

hearing and did exactly the type of thoughtful, comprehensive analysis that is required by *In re Ko.W.*, 744 A.2d 296 (D.C. 2011)." D.C. then appealed Judge McCabe's order to this court, though, due to delays as a result of D.C. changing counsel and moving for extensions of time, briefs were not filed until late 2017.

### D. Permanency Goal Change to Adoption

In addition to suspension of visitation, Magistrate Judge Albert ruled on K.C.'s permanency goal. On May 19, the last day of the three-day evidentiary hearing on visitation in May of 2016, the court also held a permanency hearing. The magistrate judge then issued an order on May 24, 2016 – the day after the May 23 order suspending visitation – in which she changed K.C.'s permanency goal from reunification to adoption. Pursuant to this court's December 8, 2016 decision in *In re Ta.L.*, 149 A.3d 1060 (D.C. 2016) (en banc), the magistrate judge revisited the permanency goal change in 2017. Because the Agency had, in the meantime, filed a motion to terminate parental rights on July 8, 2016, the court held hearings that functioned as both a retroactive *Ta.L.* inquiry into the permanency goal change and a trial on termination of parental rights ("TPR").

The hearings were held on July 17-19, 24, and 26, and August 23 and 31,

2017, and the magistrate judge heard testimony from Gordon; Abdulahad; Jakob Klaus, a social worker with Family Matters of Greater Washington, who took over from Abdulahad in October of 2016; Dr. Seth King, a DBH psychologist; Michelle Dodge, K.C.'s play therapist at the time; and Sonique Nixon, a CFSA adoption recruiter, all of whom testified on behalf of the Agency. She also heard testimony from D.C.; Dr. Ballard; Shirlene Wood Walker, a program manager with Contemporary Family Services; Natalee Hollowell, a program manager with Collaborative Solutions for Communities; Dr. Allen Gore, a psychiatrist; and Ms. G.A., K.C.'s then-foster parent, all of whom testified on behalf of D.C.

On September 29, 2017, Magistrate Judge Albert issued an order affirming the prior goal change, in which she conducted an analysis pursuant to *Ta.L* and concluded that the permanency goal for K.C. should remain adoption. She made extensive factual findings regarding the progress of the case over the preceding two years, and, based on these findings, found that a permanency goal change to adoption was appropriate based on the *Ta.L* factors.

Specifically, the magistrate judge found that (1) the Agency had provided D.C. with a reasonable and appropriate plan for reunification. More specifically, she found that the plan was designed to meet the needs of the family by providing

services that would help K.C. to stabilize and progress academically and socially, and would help D.C. to improve her mental health so that she could adequately parent her son and meet his needs. She likewise found that (2) the Agency had made reasonable efforts towards reunification, as it consistently made efforts to provide D.C. with visitation and to assist her in receiving mental health services, despite the obstacles presented by D.C.

The magistrate judge also found that (3) D.C. had failed to make adequate progress towards satisfying the requirements of the plan. She noted that, while D.C. did take many of the steps and receive many of the services that were ordered by the court, "participation in services does not equal progress," and "[f]undamentally, the case [wa]s in the same posture it was at the time of the initial hearing." She noted that D.C. had not demonstrated any insight into her mental health problems or K.C.'s educational needs, but rather continued to make delusional assertions regarding the actions of school staff and Agency staff, and to blame others for her situation and K.C.'s situation – and thus, if K.C. were returned to D.C.'s care, it was just as likely then as it was on the day of his removal that his educational and social development would be stunted if he were to stay with his mother.

Finally, she held that (4) the Agency had adequately explored other vehicles for avoiding the termination of parental rights, including kinship placements, discussing at length the Agency's ultimately fruitless attempts to pursue placements with kin who had been suggested by the parents (one of D.C.'s relatives and two of K.C.'s father's relatives). She also explained that adoption would be a preferable option to guardianship, given K.C.'s youth and his need for long-term stability. Accordingly, the magistrate judge affirmed her prior goal change order and held that K.C.'s permanency goal would remain adoption.

D.C. filed a motion for review of this order by an associate judge of the Superior Court, and, on October 31, 2017, Associate Judge Julie H. Becker affirmed the September 29 order. Judge Becker reviewed the evidence closely and examined Magistrate Judge Albert's findings with respect to the factors to be considered in a *Ta.L* analysis. She held that the magistrate judge did not err and that her order must be upheld. The reviewing judge specifically addressed several of D.C.'s contentions, including her claims that the Agency had never actually provided D.C. with a reasonable case plan or communicated its requirements to her, and likewise did not work with her to refine and update the plan over time; that the Agency did not make sufficient efforts to assist D.C. to reunify with her son; that the Agency and the magistrate judge's expectations of progress for D.C.

were unfair; and that the Agency's efforts to find kinship placements were inadequate. The reviewing judge found all of these contentions to be without merit.

To the contrary, the reviewing judge found that (1) it was clear from the evidence that the government had, in fact, provided D.C. with a plan for reunification, as Gordon attempted to present a case plan to D.C. and discuss it with her (and her attorney) many times, but she refused, and the magistrate judge also ensured that D.C. was aware of the plan requirements at the hearings. Furthermore, the fact that D.C. engaged in the steps required by the plan undermined any claim that the plan was not communicated to her or that she did not understand it. As to working with D.C. to refine the plan or providing D.C. with benchmarks along the way, the evidence indicated that it was D.C. herself who "refused to participate in the case-planning process" by consistently rebuffing the Agency's efforts. It was also clear that the plan was reasonable, as K.C. was removed from D.C.'s care for educational neglect, largely as a result of D.C.'s mental health issues, and the plan was designed to help D.C. address her mental health and parenting issues so that she could handle K.C.'s educational and behavioral challenges going forward. As to D.C.'s assertion that the Agency expected her to "disavow her belief that her child had been bullied" and thus

should have included an explicit requirement in the plan that she do so, the reviewing judge found that this claim oversimplified the expectations regarding D.C.'s mental health treatment. D.C.'s mental health issues were preventing her from allowing K.C. to make academic, social, and emotional progress, and the services required by the plan were designed to help D.C. overcome her mental health issues so that she could adequately care for K.C. and meet his needs.

The reviewing judge likewise found that (2) the government made reasonable efforts to assist D.C. to reunify with her son, basing her finding on the fact that the Agency repeatedly attempted to help D.C. obtain appropriate mental health services, and the fact that, despite D.C.'s refusal to engage and her demonstrated suspicion and paranoia regarding the Agency, the agency continued to maintain D.C.'s visitation with K.C. for over a year, despite D.C.'s extremely problematic behavior during visits.

Judge Becker also agreed with Magistrate Judge Albert that (3) "participation does not equal progress," and that D.C. simply had not made the progress that would have been necessary for her to "relate to her son in a positive, productive way" – as demonstrated by her conduct during visits, even a year after K.C.'s removal, which ultimately led to the suspension of visitation. During her

testimony, D.C. still blamed the school system, rather than herself, for her son's repeated school changes and negative educational experiences, stated that she did not understand why visits were suspended, and accused Gordon of telling lies about her. The record showed that, while D.C. did indeed complete many of the steps required by the plan, she continued to manifest the same beliefs and behaviors that resulted in her son's educational neglect and removal from the home – and thus it would be inappropriate to return him to her care.

Finally, Judge Becker rejected D.C.'s assertion that (4) the government had not done enough to find kinship placements. She noted that, as discussed by Magistrate Judge Albert, CFSA made efforts to reach out to relatives of both D.C. and the father to explore their potential as adoptive parents for K.C., and additionally noted that D.C. herself created barriers for CFSA by refusing to provide the names of relatives, apparently because she did not trust the Agency.

In sum, the reviewing judge found that the evidence in the record amply supported the magistrate judge's conclusion that a permanency goal change to adoption was appropriate under the *Ta.L.* factors and affirmed the magistrate judge's decision. D.C. then appealed the reviewing judge's October 31, 2017 final order to this court, though, again, due to delays on D.C.'s part, briefs were not filed

until the spring of 2018.

## E. Termination of Parental Rights

On January 29, 2018, Magistrate Judge Albert issued findings of fact and conclusions of law, granting the Agency's TPR petition and terminating D.C.'s parental rights. Based on the combined seven-day proceedings in July and August of 2017, which functioned both as a *Ta.L.* hearing and a TPR trial, she made extensive findings regarding all of the developments that occurred in the case since it was opened in March 2015, including credibility determinations with respect to the witnesses.[4]

The magistrate judge fully credited the testimony of all of the government witnesses: the three social workers (Gordon, Abdulahad, and Klaus), as well as Dodge (K.C.'s then-play therapist) and Dr. King (who had evaluated both D.C. and

---

[4] As noted above, Gordon; Abdulahad; Jakob Klaus, a social worker with Family Matters of Greater Washington; Dr. Seth King, a DBH psychologist; Michelle Dodge, K.C.'s therapist; and Sonique Nixon, a CFSA adoption recruiter, testified for the government, while D.C.; Dr. Ballard; Shirlene Wood Walker, a program manager with Contemporary Family Services; Natalee Hollowell, a program manager with Collaborative Solutions for Communities; Dr. T. Allen Gore, a psychiatrist who worked with Contemporary Family Services; and Ms. G.A., K.C.'s then-foster parent, testified for D.C.

K.C.).[5] She only partially credited the testimony of Dr. Ballard, noting that he did not review collateral documentation regarding the situation and took D.C.'s statements at face value, without verification, many of which were "easily disproven at trial" – and, when confronted with these facts, he still maintained she was not delusional. She also noted that Dr. Ballard opined that D.C. was a fit parent, despite never having met K.C. or observed D.C. interacting with K.C. The magistrate judge did credit Dr. Gore, but noted that his testimony was not helpful, given that he had had limited interaction with D.C. and had assessed only her ability to function independently in the community. She did not credit D.C.'s testimony at all, finding that, while it was clear that D.C. loved her son, her testimony was "confusing and contrary to much of the testimony presented by other witnesses," which the magistrate judge found to be a "manifestation of [her] mental illness," and finding that D.C.'s behavior and demeanor at trial – including interrupting witnesses and leaving the room – were consistent with Gordon's description of her "uncontrollable" behavior throughout the course of supervised

---

[5] The court also appeared to credit the testimony of Sonique Nixon, the CFSA adoption recruiter, that he could find a permanent adoptive home for K.C., but mentioned his testimony only briefly.

visitation.[6]

Having made findings of fact regarding K.C.'s significant academic and social deficits as a result of D.C.'s conduct, D.C.'s stipulation to the educational neglect of K.C., D.C.'s continuing mental health issues, and the harmful effect of D.C.'s behavior on K.C. since the inception of the case, the magistrate judge concluded that there was clear and convincing evidence that D.C. was an unfit parent.

Magistrate Judge Albert then considered four statutory TPR factors[7] to determine whether terminating D.C.'s parental rights was in K.C.'s best interests.

Regarding (1) the need for continuity of care, the magistrate judge found, based on the testimony of the government experts, that K.C. "was without any sense of stability while in his mother's care due to her mental health issues," and

---

[6] *See In re A.B.*, 955 A.2d 161, 167 (D.C. 2008) ("[T]he trial judge here committed no error by factoring her own observations of [the mother's] behavior into her evaluation of [the mother's] mental and emotional health.").

[7] As discussed below, there are two additional factors, related to abandonment of an infant at a hospital and to drug use, which are not relevant in this case.

that her behavior both before and after his removal had instilled in him a tendency to run away from problems, a distrust of people in positions of authority, a lack of trust in others, and a tendency to act out to prevent rejection or exert control. Noting that K.C. had been in foster care for two years of his ten-year life, and had initially found stability in a foster home, she found that his mother's behavior at visits had contributed to the disruption of K.C.'s foster placements and his multiple hospitalizations. Because D.C. consistently failed to acknowledge her role in K.C.'s neglect and removal or her own mental health issues, and continued to deny the need for any assistance, she was unable to provide him with the "consistency and stability he needs."

As to (2) the physical, mental, and emotional health of all individuals, while the magistrate judge did not necessarily conclude that D.C. suffered from delusional disorder, she found that D.C.'s opinions and beliefs were not based in reality and she presented rigid thinking that could not be challenged – including with respect to her persistent and totally unfounded belief that other people, especially school officials, were harming K.C. Yet, D.C. failed to consistently engage with mental health services and, up to the time of trial, denied that she needed mental health services and showed a lack of insight into K.C.'s needs. She also failed to meet K.C.'s mental and emotional health needs, as she disrupted his

medical appointments, refused to consent to medication for him – to the point that a medical decision-maker had to be appointed for him – and continued to deny that he had any issues or deficits or that he required any remedial support. The magistrate judge concluded that D.C. had demonstrated that she could not be the supportive and committed caregiver that K.C. needs to be healthy.

With respect to (3) the quality of interaction and interrelationships, the magistrate judge found that, while D.C. loves K.C., D.C.'s behavior during more than a year of visitation established that she was fixated on her belief that K.C. was being harmed and spent a significant part of her time with him trying to assess him for injuries, audio and video record him, or discuss the case with him, even spending part of two visits trying to report allegations of abuse against him – yet she showed no insight into the ways her behavior had damaged him. The court also credited K.C.'s play therapist's statement that he had disorganized attachment as a result of D.C.'s upbringing. Thus, the court found that this factor weighed in favor of TPR.

Regarding (4) K.C.'s opinion of his own best interests, the magistrate judge found that K.C. was only ten years old and, while he loved both of his parents, he was too young to make a decision regarding his own best interests. She noted

K.C.'s play therapist's testimony that, while K.C. was confused by his emotions, he did not express a desire to return to his mother's care and expressed disappointment in his mother for his inability to read (as a result of her moving him from school to school). She also noted that K.C.'s behavior indicated that he had been stabilizing and making progress outside his mother's care. Therefore, the court held that this factor supported TPR.

Magistrate Judge Albert concluded that all relevant TPR factors weighed in favor of termination. Taking her determination of D.C.'s unfitness together with her analysis of the TPR factors, which demonstrated that termination of D.C.'s parental rights was in the best interests of K.C., the magistrate judge granted the government's motion to terminate the parent-child relationship between D.C. and K.C.

D.C. moved for review of this decision by an associate judge of the Superior Court, and, on April 24, 2018, Associate Judge Becker issued an order affirming the decision. This order again examined the evidence in the record, as well as the magistrate judge's factual findings and legal conclusions with respect to parental unfitness and the TPR factors, conducting a thorough analysis of the decision. The reviewing judge also addressed each of D.C.'s contentions on review.

Addressing the finding of unfitness, Judge Becker rejected D.C.'s argument that Magistrate Judge Albert failed to take into account D.C.'s conduct during the fourteen-month period between the suspension of visitation in May of 2016 and the TPR trial in July and August of 2017. She noted that the magistrate judge properly found that D.C.'s behavior throughout the course of visitation was inappropriate and harmful to K.C., and the evidence showed that, even after visitation was suspended, the treatment team reviewed the suspension monthly and consistently decided not to resume visits due to D.C.'s continued emotional and mental instability. The reviewing judge also noted that D.C.'s own testimony at the trial in 2017 demonstrated that she still did not grasp the reality of the situation and that her parenting capacity had not improved since visitation was suspended in 2016.

The reviewing judge further held that the magistrate judge properly concluded that D.C.'s mental health status had not meaningfully changed by the time of the mid-2017 trial. The testimony from Klaus established that, in November of 2016, D.C. was still claiming that it was the school district, not her, who had moved K.C. between multiple schools, and she accused previous social workers of lying about what had happened during her visits. Furthermore, testimony from Shirlene Wood Walker from Contemporary Family Services

established that, even though D.C. sought mental health treatment there following the suspension of visitation in May of 2016, she did not inform them of her involvement with CFSA, and they did not find out about it until shortly before the July 2017 TPR trial – at which point D.C. made similar claims to Wood Walker as she had made to Klaus regarding the school district, not her, moving K.C. between schools.  Finally, throughout the trial, D.C. continued to deny that she had any mental health issues or required any treatment, thereby demonstrating a lack of improvement in her mental health.  Thus, the reviewing judge held that the magistrate judge's conclusion that D.C. was an unfit parent was supported by ample evidence.

Addressing the TPR factors, Judge Becker again reviewed Magistrate Judge Albert's findings in depth.  As to (1) the need for continuity of care, the reviewing judge found D.C.'s argument that K.C. had been in six foster placements since his removal from the home unavailing.  The government's experts, which the magistrate judge credited, testified that that K.C.'s "time with his mother had left [him] with attachment problems, substandard coping skills, and educational deficits," and also noted that D.C. had created in K.C. a distrust of adults.  Thus, she held that the magistrate judge properly found that K.C. lacked stability when he lived with D.C., and that returning him to D.C.'s care would again put him in an

unstable situation, so the magistrate judge did not err in finding that this factor supported TPR.

Similarly, with respect to (2) the physical, mental, and emotional health of all individuals, the reviewing judge was unpersuaded by D.C.'s assertions that she had never been diagnosed with a mental illness and that there was no recent evidence of her mental health issues. Given the factual and expert testimony regarding D.C.'s behavior, the reviewing judge held that the magistrate judge properly concluded that D.C.'s specific diagnosis was immaterial, as the salient factor was that her "behavior [wa]s damaging to K.C.'s well-being." And she found that, as discussed above, the record amply supported the conclusion that D.C.'s "refusal to seek appropriate mental health treatment persisted long after visits were suspended" and that she continued to deny any responsibility for the situation and to blame others. Additionally, the reviewing judge held that the evidence supported the magistrate judge's conclusion that D.C. was not equipped to address K.C.'s needs, as the expert testimony established that D.C.'s mental health issues – which she failed to acknowledge or properly address – as well as her refusal to fully acknowledge K.C.'s educational deficits, made it unlikely that she would be able to address K.C.'s significant mental and emotional health needs.

As to (3) the quality of interaction and interrelationships, Judge Becker acknowledged that D.C. correctly noted that there had been no interaction between D.C. and K.C. after visits were suspended in 2016. However, she also noted that the magistrate judge found, based on the evidence offered at trial, that D.C.'s mental health and behavior had not improved after the suspension of visitation, and thus did not err in drawing conclusions based on D.C.'s interactions with K.C. during the visitation. Moreover, she held that the magistrate judge was entitled to credit the play therapist's testimony that K.C. had disorganized attachment as a result of his upbringing by D.C., and properly considered K.C.'s healthy interactions with other adults in his life after visitation was suspended, which provided evidence that K.C. was improving outside of D.C.'s care. Thus, Judge Becker found no error in Magistrate Judge Albert's conclusion that this factor supported TPR.

Finally, regarding (4) the child's opinion of his own best interests, the reviewing judge discerned no error in the magistrate judge's determination that K.C. was too young to express an opinion of his own best interests – though the reviewing judge did note the magistrate judge's finding that K.C. did not speak about his mother to his play therapist and appeared to blame his mother for his educational delays. As to D.C.'s assertion that K.C.'s behavior problems after

being removed from D.C.'s home were evidence that he believed it was in his best interests to be returned to D.C.'s home, the reviewing judge found this argument to be meritless, as K.C.'s behavior problems in foster care "could have any number of underlying sources," particularly given that Dr. King testified that K.C., like most children, reacts negatively to changes in his routine," and K.C. had endured a number of changes since his removal from the home.

In sum, Judge Becker concluded that Magistrate Judge Albert did not err and that the magistrate judge's decision terminating parental rights must be upheld. D.C. then timely appealed the associate judge's final order affirming the TPR to this court.

On June 14, 2018, we consolidated the appeals on the suspension of visitation, permanency goal change, and TPR, and briefs on the TPR were filed in the summer of 2018. On September 13, 2018, we granted D.C.'s motion to submit the three consolidated cases on the record without oral argument.

## II. REVIEW OF SUSPENSION OF VISITATION

We turn first to the suspension of visitation. D.C. contends that the trial

court abused its discretion in suspending her visitation with K.C., arguing that it did not adequately consider the possible negative effects of K.C.'s father's behavior or Mary Gordon's behavior on K.C., instead unfairly blaming K.C.'s deterioration on D.C. She asserts that K.C.'s behavior deteriorated further, rather than improved, after her visits with him were suspended, which she suggests is indicative of the fact that her behavior was not detrimental to K.C. She further argues that the trial court did not adequately consider the harm that K.C. would suffer from not seeing his mother, who had been his primary caregiver his entire life. Finally, she argues that it was an abuse of discretion for the trial court to suspend visitation when neither D.C.'s therapist nor K.C.'s play therapist asserted that D.C.'s visits were the cause of K.C.'s worsening condition or made therapeutic recommendations that D.C.'s visits be discontinued. On a related note, she takes issue with the trial court's determination that D.C.'s personal therapist, Dr. James Ballard, was not a credible witness, as well as its finding that Daryl Lashley's testimony was of limited relevance.

"An order denying a parent the right to visit his [or her] child may be appealed to this court, and we review for abuse of discretion." *In re D.B.*, 947 A.2d 443, 446 (D.C. 2008) (internal citation omitted). In conducting our review, we look to the final order of the associate judge, as well as the decision of the

magistrate judge on which that order is based. *In re S.L.G.*, 110 A.3d 1275, 1285

(D.C. 2015).[8] We have noted that "a trial court abuses its discretion when it rests

---

[8] As we stated in *In re S.L.G.*:

> As a procedural matter, we now are reviewing the order of the associate judge, who reviewed the magistrate judge's order in this case for errors of law, abuse of discretion, or clear lack of evidentiary support. But as we have said, our powers of appellate review are not so limited that, in reviewing the associate judge's final order we may not look to the findings and conclusions of the fact finder on which that ruling is based. Rather, we review the magistrate judge's factual findings as the findings of the trial judge and review for abuse of discretion or a clear lack of evidentiary support. As to alleged errors of law, however, we review the record *de novo*, without deference to the judges below.

*In re S.L.G.*, 110 A.3d at 1285 (citations, internal quotation marks, and brackets omitted); *see also In re J.M.*, 193 A.3d 773, 781 (D.C. 2018); *In re J.J.*, 111 A.3d 1038, 1043-44 (D.C. 2015); *In re C.A.B.*, 4 A.3d 890, 902-03 (D.C. 2010); *see generally* D.C. Code § 11-1732 (j)(5), (k) (2018 Supp.) (magistrate judges may make findings and enter final judgments in family matters; these orders may be reviewed by an associate judge and appeals may be taken only from final orders of associate judges); D.C. Fam. Ct. R. D(e)(5) (an associate judge reviewing a magistrate judge's final order applies the same standard of review as the Court of Appeals and may not set aside findings of fact unless clearly erroneous, nor set aside the judgment except for legal error or abuse of discretion).

We note that, while it is not the role of the associate judge to duplicate the work of the magistrate judge, an associate judge is not limited in her review. Where an associate judge examines the record and cites additional evidence that supports the magistrate judge's holdings, particularly insofar as doing so is necessary to address the arguments and claims of error made by the party petitioning for review – and as occurred here in the context of the permanency goal

(continued…)

its conclusions on incorrect legal standards" or "when it makes an error of law." *In re Ko.W.*, 774 A.2d 296, 303 (D.C. 2001) (citations omitted). Moreover, its determination must "be based upon and drawn from a firm factual foundation. . . . It is an abuse of discretion if the stated reasons do not rest upon a sufficient factual predicate." *Id.* at 303 (citation and brackets omitted). However, "[t]he appellate court role in reviewing the exercise of discretion is supervisory in nature and deferential in attitude." *In re D.B.*, 947 A.2d at 446 (citation omitted).

We have recognized a non-custodial parent's right of visitation with a child, stating that the parent "ought not to be denied that right unless by his [or her] conduct he has forfeited his right, or unless the exercise of the right would injuriously affect the welfare of the children." *In re Ko.W.*, 774 A.2d at 304 (citation omitted). We have likewise acknowledged "a natural parent's right to develop a relationship with a child," *id.* (citation omitted), and noted that "[t]he long-term denial of visitation rights will interfere with that right." *Id.*; *see also* Super. Ct. Neg. R. 15(b)(4). However, we have also observed that visitation "is not an absolute right" and "must yield to the good of the child." *Maybin v.*

---

(…continued)
change and TPR proceedings – we review the associate judge's decision to ensure that it is supported by sufficient evidence in the record.

*Stewart*, 885 A.2d 284, 287 (D.C. 2005) (citation omitted). Indeed, a "proper exercise of discretion requires that a court fashion relief to foster and safeguard the child's best interests." *Id.* (citation, internal quotation marks, and brackets omitted).

We find no abuse of discretion in the trial court's decisions. As discussed above, the magistrate judge held a three-day evidentiary hearing, heard testimony from six witnesses, and made comprehensive findings of fact that supported her conclusion that visitation with D.C. was detrimental to K.C.'s best interests. She drew upon abundant evidence in the record, including factual and expert testimony, in her detailed discussion of D.C.'s erratic, disruptive, and inappropriate conduct during visits and appointments, as well as her evaluation of the effects of this conduct on K.C., who struggled to cope with his mother's behavior, and would often become emotionally dysregulated and aggressive as a result. Thus, Magistrate Judge Albert found that suspension of visitation with D.C. was in the best interests of K.C. As discussed above, see *supra* I.C., this holding was supported by the evidence, and Associate Judge McCabe affirmed on this basis, finding that the magistrate judge had "conducted a thorough evidentiary hearing" and provided "a thoughtful, comprehensive analysis" of the situation.

We find no merit in D.C.'s speculations to the contrary. At the May 2016 hearing, there was no evidence presented regarding the effect of K.C.'s father's behavior on K.C., any alleged detrimental effect of Gordon's behavior on K.C., or the possible harm to K.C. as a result of not seeing his mother. Given that we, as an appellate court, do not engage in factfinding, and given that these issues were not raised before or addressed by the trial court, they are simply outside the scope of our review.[9] D.C.'s assertions regarding the further deterioration of K.C.'s behavior after the suspension of visitation are likewise beyond the scope of our review, as we must consider the record at the time the suspension order was issued by the magistrate judge, and we cannot speculate as to what may or may not have happened afterward.

As to D.C.'s contentions that Magistrate Judge Albert should not have suspended visitation without a therapist's recommendation, this argument is unavailing, as the magistrate judge was not required to rely on an explicit recommendation of this nature in order to suspend visitation. *See In re P.B.*, 54 A.3d 660, 665-66 (D.C. 2012) ("[T]he neglect statute is a remedial enactment

---

[9] *See, e.g.*, *V.C.B. v. United States*, 37 A.3d 286, 291 (D.C. 2012) ("It is incumbent upon us, in this case as in any other, to eschew appellate fact-finding, and to avoid usurping the function of the trial court." (internal citation and quotation marks omitted)).

designed to protect the welfare of neglected and abused children, and it must be liberally construed to achieve that end. The trial court has the paramount obligation and broad authority to protect the best interests of the child." (citations and internal quotation marks omitted)). As to the magistrate judge's witness credibility determinations, we note that she provided reasoned explanations for her findings that Lashley's testimony was of limited relevance and that Dr. Ballard's testimony was not credible – and, in any event, "in non-jury trials, it is within the province of trial judges to observe the demeanor of witnesses and to make credibility determinations, which inform the judges' decisions," *In re A.B.*, 955 A.2d 161, 167 (D.C. 2008), and we "will not redetermine the credibility of witnesses where . . . the trial court had the opportunity to observe their demeanor and form a conclusion." *In re N.D.*, 909 A.2d 165, 171 (D.C. 2006) (quoting *In re E.H.,* 718 A.2d 162, 169 (D.C. 1998)).

While we do not take lightly the decision to suspend a parent's right to visitation with her child, the magistrate judge's decision and the associate judge's order affirming it rested on a firm factual foundation, supported by the evidence, and we discern no legal error or abuse of discretion in their holdings. Therefore, we do not disturb them on appeal.

## III. REVIEW OF PERMANENCY GOAL CHANGE TO ADOPTION

D.C. also challenges the change of K.C.'s permanency goal to adoption. D.C. argues, as she did below, that (1) the Agency failed to provide a reasonable plan for reunification, as no case plan was filed with the court, the court's orders, in and of themselves, do not amount to a plan, and the plan neither included benchmarks and goals nor was updated over time. She also argues that (2) the Agency failed to make reasonable efforts toward reunification, as Gordon did not make sufficient efforts to give D.C. the case plan, meet with her to discuss the plan, or monitor or supervise her therapy, and CFSA did not recommend or appoint a parent advocate for D.C. She further argues that (3) the court's finding that D.C. failed to make adequate progress toward reunification was unfounded and unfair, given that she took the steps that were required under the plan. Finally, D.C. contends that (4) the Agency's efforts to explore kinship placements in order to avoid TPR were insufficient.

In *Ta.L.*, we recognized that, "[t]he decision to change the goal for a child from reunification to adoption is more than just a step in the neglect process. It is a critical point in the proceedings, one that often irreversibly dictates the result of a child's ultimate custody disposition at a subsequent adoption proceeding." *In re*

*Ta.L.*, 149 A.3d at 1076. Accordingly, we held that due process requires a formal hearing before a permanency goal can be changed to adoption, and that, "[a]t such a hearing, the government must produce sufficient evidence from which a trial court can find by a preponderance of the evidence that the presumption in favor of reunification has been rebutted before the goal can be changed from reunification to adoption." *Id.* at 1078. Specifically, under our statutory framework, the court must find that the government "has provided the parents with a reasonable plan for achieving reunification, that it expended reasonable efforts to help the parents ameliorate the conditions that led to the child being adjudicated neglected, and that the parents have failed to make adequate progress towards satisfying the requirements of that plan." *Id.*; *see also* D.C. Code § 16-2323 (d) (2018 Supp.). The court must make findings that "(1) the District has in fact expended reasonable efforts to reunify the family . . . ; (2) the goals set for the parents were appropriate and reasonable; and (3) other vehicles for avoiding the pursuit of termination, e.g., kinship placements have been adequately explored." *In re Ta.L.*, 149 A.3d at 1079 (internal citations omitted).

We have also noted that, at the hearing, "parents must have an opportunity to challenge any statements, observations, and evaluations that form the basis of CFSA's recommendation to the court to change the permanency goal." *Id*. We

have likewise held that the hearing must be a forum in which "parents can testify, under oath," regarding the government's alleged failings and their own efforts, and can "present any other evidence." *Id.* Then, "[b]ased on the evidence presented at the hearing, the trial court will be able to make findings of fact and conclusions of law that will allow this court to conduct a meaningful review of the trial court's permanency decision," *id.*, with the standard of review being abuse of discretion, meaning we will affirm if the court "exercised its discretion within the range of permissible alternatives, based on all relevant factors and no improper factor." *Id.* (citation and internal quotation marks omitted). Finally, we have held that "a change in the permanency goal of a neglect case from reunification to adoption is an order subject to immediate appellate review." *Id.* at 1076.

In sum, in a neglect case, a trial court's change of a child's permanency goal from reunification to adoption is immediately appealable to this court, and we will review for abuse of discretion, upholding the trial court's decision if it held a full hearing and found, by a preponderance of the evidence, that:

> (1) the government provided the parents with a reasonable plan for achieving reunification;
>
> (2) the government made reasonable efforts to help the parents ameliorate the conditions of neglect and to reunify the family;

(3) the parents failed to make adequate progress toward the goals of the plan; and

(4) other options for avoiding the termination of parental rights, including kinship placements, have been adequately explored.[10]

Reviewing under this standard, we affirm K.C.'s permanency goal change from reunification to adoption.[11] In this case, Magistrate Judge Albert held a seven-day hearing, at which D.C. testified on her own behalf and presented five additional witnesses, so we are satisfied that the trial court provided a full hearing at which the parent could testify and present evidence.[12] As discussed at length

---

[10] This four-pronged formulation of the findings that the court must make integrates the two three-pronged formulations that are articulated on pages 1078 and 1079 of *Ta.L.*, quoted above, as those formulations overlap in their first two prongs. Thus, there are four factors in total that the court must consider. *In re Ta.L.*, 149 A.3d at 1078-79; *see also In re J.M.*, 193 A.3d at 781.

[11] As with suspension of visitation, in conducting our review, we review the final order of the associate judge, as well as the decision of the magistrate judge on which that order is based. See *supra* note 8.

[12] We find no error in Magistrate Judge Albert holding a "retroactive" permanency goal change hearing in 2017 and issuing an opinion following that hearing, nor do we find error in Judge Becker reviewing that opinion and issuing a decision – which decision was timely appealed to this court, making our review timely and proper – because, contrary to the contentions of the government, we have held that *Ta.L.* applies retroactively. *In re Sa.C.*, 178 A.3d. 460 (D.C. 2018); *see also In re J.M.*, 193 A.3d at 780. We note, however, that the court has granted a petition for rehearing en banc in a case in which the government is challenging the continued retroactive application of *Ta.L. See In re S.M.*, No. 17-FS-1192 (D.C. 2017), *petition for reh'g en banc granted* (March 30, 2018).

(continued…)

above, see *supra* I.D., in concluding that the *Ta.L.* factors supported a permanency goal change to adoption, the magistrate judge made specific, detailed, and comprehensive findings of fact and conclusions of law, which were based on extensive evidence, including factual and expert testimony. She made reasoned determinations, supported by the record, that the government provided the family with a reasonable plan for reunification, that the government made reasonable efforts toward reunification, that D.C. failed to make adequate progress toward reunification, and that the government explored other alternatives to avoid TPR. Judge Becker then reviewed the decision, examining the considerable evidence in the record, analyzing Magistrate Judge Albert's holdings, and rendering an independent judgment that each of the four applicable factors was indeed satisfied by a preponderance of the evidence and that a goal change to adoption was appropriate. Both decisions rested on firm factual foundations, applied the relevant law without error, and permissibly exercised discretion.

As to D.C.'s arguments on appeal, they are without merit. Her challenges to (1) the government's plan for reunification misapprehend both the facts and the law. She argues that the Agency did not file a written case plan with the court, and

---

(…continued)

that this was error, particularly since the court's orders, in and of themselves, do not amount to plan. Yet, as noted by Judge Becker, there is no requirement in our case law that the government's "plan" must necessarily be a written case plan from the Agency per se, or that the court's orders cannot satisfy the requirements of creating and communicating a plan to the parent.[13] Moreover, the record shows that the social worker did, in fact, attempt to provide a written CFSA case plan to D.C., but D.C. refused to accept it, and she also declined the social worker's requests to meet and discuss the case plan with her – such that the social worker resorted to consistently reminding her of the plan requirements at supervised visits, and she also communicated them to D.C.'s attorney.

As to D.C.'s related contention that the plan was inadequate because it neither included benchmarks and goals nor was updated over time, as discussed above, the record established that D.C. refused to participate in the case-planning process and hampered the Agency's efforts to work with her on the plan. Had she desired a better tailored or more responsive plan, she was certainly free to collaborate with the Agency on this – but she did not. She cannot now argue, well

---

[13] *See In re J.M.*, 193 A.3d at 781-82 (the birth mother's signature on the plan document was not required, particularly where the plan was consistent with the court's order).

after the fact, that the Agency should have done even more than it already did to overcome her uncooperativeness.

D.C.'s assertion that (2) the Agency failed to make reasonable efforts is simply unsupported by the facts. The record shows that the Agency made every effort to ensure that D.C. had the opportunity to visit with K.C., including by being flexible with respect to timing and by accommodating D.C.'s location requests, and – importantly – despite D.C.'s consistently inappropriate behavior at the visits, which she continued to display even after being instructed to stop by the social worker and ordered to stop by the court on multiple occasions. The record also shows that the Agency made repeated efforts to assist D.C. in meeting the requirements of the plan with respect to mental health services, but she refused to engage at every turn – for example by refusing to speak with Agency staff about the plan, by refusing to provide her phone number to Agency staff, and by asserting that she did not need mental health treatment and would not contact any providers associated with the Agency, despite being given the hotline number for providers at least five times.

On a related note, D.C.'s assertion that the Agency did not effectively monitor her therapy cannot be squared with the record, which shows that D.C.

withheld information about her treatment from the Agency and then, once the Agency learned that she was seeing her own therapist, refused to waive privilege so that the social worker could speak with her therapist. Meanwhile, the social worker was diligent in attempting to communicate with D.C. and the therapist and to ensure that the therapy was sufficient to meet D.C.'s needs, but was unable to persuade either the therapist or D.C. to change course. If there was a failure to make reasonable efforts, it appears to have been on D.C.'s part, not the Agency's part.[14]

D.C. next takes issue with (3) the trial court's finding that she did not make adequate progress toward reunification, arguing that she took the steps required by the plan, and the court cannot expect more from her. As an initial matter, we note that D.C. did not fulfill all the requirements of the plan. As discussed above, she consistently violated the supervised visitation requirements, denied the need for therapy and withheld information about her therapist, refused to attend an educational meeting for K.C., and was disruptive at K.C.'s medical appointments. Still, even accepting that D.C did complete many of the steps required by the plan,

---

[14] *See In re J.M.*, 193 A.3d at 785 ("the reasonable efforts standard does not burden the agency with the additional responsibility of holding the hand of a recalcitrant parent" (citation and internal quotation marks omitted)).

as noted, both the magistrate judge and the reviewing judge specifically addressed this argument, finding that it is not enough for a parent to simply go through the motions of a plan, as participation does not equal progress; rather, the parent must meaningfully progress toward remedying the neglect conditions that led to removal, in order to ensure that reunification would be safe and healthy for the child. This is the correct standard under *Ta.L.*, in which we held that a goal change requires the government to prove, among other things, that "the parents have failed to make adequate progress towards satisfying the requirements of th[e] plan," and stated that "the primary focus of the permanency planning hearing should be on the parents' efforts to ameliorate the conditions that led to the neglect and the [government's] efforts to assist them in achieving those goals." *In re Ta.L.*, 149 A.3d at 1078. Thus, the parent must indeed make progress, and it is apparent from the record in this case that D.C. did not make the progress that would be required for her to safely and effectively meet K.C.'s needs.

Indeed, as both the magistrate judge and the reviewing judge found, in the two years that elapsed between K.C.'s removal from the home and the *Ta.L.* permanency goal change hearing, D.C.'s mental health had not improved, she refused to accept any responsibility for K.C.'s situation, and she showed no insight into K.C.'s academic, emotional, and behavioral needs. While D.C. did fulfill

many of the requirements of the plan with respect to evaluations, parenting classes, and, in some sense, therapy – and the trial court judges acknowledged as much – she did not follow the plan fully or, it seems, in good faith. As set forth in detail throughout the discussion above, D.C. refused to meaningfully engage with Agency staff or service providers with respect to her mental health, violated the conditions on her supervised visitation with K.C., and made it difficult to communicate or cooperate with her. Under these circumstances, D.C. failed to make adequate progress.[15] Her arguments regarding her partial compliance with the plan are unavailing, and we find no support for her contention that the magistrate judge erred in her determination or the reviewing judge erred in her affirmance with respect to this prong of the analysis.

Finally, D.C. contends that (4) the government's efforts to explore kinship placements in order to avoid TPR were insufficient, as D.C. testified at the permanency goal change hearing that she has an extended family network that could be a resource in finding an adoptive placement for K.C. Yet, as described in

_____

[15] *See also In re Tw.P.*, 756 A.2d 402, 411 (D.C. 2000) (where mother did not fully comply with the plan, "the goal was changed to adoption [because] [i]t was decided that despite efforts to provide [the mother] with the services necessary to remedy her parenting deficiencies, she had made little progress towards reunification [and] lacked an understanding of the special needs of the children.").

detail by the magistrate judge and the reviewing judge, CFSA did make significant efforts to find a suitable kinship placement, although these efforts ultimately did not succeed. And, importantly, as with the other prongs of the analysis, D.C. does not make her argument with clean hands: as the reviewing judge noted, D.C. herself obstructed the Agency's efforts to contact additional kin, refusing to provide Agency staff with the names of her relatives, apparently based on her mistrust of the Agency.

For all these reasons, we find that the government proved by a preponderance of the evidence that the permanency goal change factors were satisfied, and that there was no abuse of discretion in the magistrate judge's holding or the reviewing judge's holding.

## IV. REVIEW OF TERMINATION OF PARENTAL RIGHTS

Finally, D.C. contends that her parental rights were improperly terminated because the trial court failed to consider all relevant factors when analyzing the TPR criteria. Specifically, D.C. argues that, as to (1) continuity of care, K.C. was more stable in D.C.'s home than outside of it, as K.C.'s multiple changes in caregivers and psychiatric hospitalizations all occurred after he was removed from

D.C.'s care, and also that adoption recruitment efforts for K.C. have been unsuccessful thus far, meaning that TPR is highly likely to leave K.C. without a permanent home. As to (2) the physical, mental, and emotional health of all, she argues that the trial court improperly focused on D.C.'s culpability rather than the condition of the child, that K.C.'s mental and emotional health did not improve after he was removed from D.C.'s care, and that, if D.C.'s mental health is still an issue, this is a sign that the plan and services provided by the Agency were deficient, given that she complied with the plan. She next argues that, as to (3) the quality of interaction and interrelationship, the trial court failed to consider that K.C.'s behavior did not improve after his interaction with D.C. was suspended, that the court lacked information on the interaction of K.C. and D.C. following suspension of visitation, and that K.C. would suffer as a result of the loss of interaction with his mother. Finally, as to (4) the child's opinion of his own best interest, D.C. asserts that, "[a]bsent powerful evidence to the contrary, it should be presumed that K.C. believes it is in his own best interests to be returned to his mother."

In analyzing D.C. Code § 16-2353, which addresses the termination of parental rights, we have identified three purposes underlying the statute: "(1) to encourage stability in the life of the neglected child; (2) to ensure the recognition

and enforcement of the constitutional rights of all parties; and (3) to increase the opportunities for *prompt* adoptive placement." *In re Tw.P.*, 756 A.2d 402, 408 (D.C. 2000) (citation omitted); *see also* D.C. Code § 16-2353 (b) (2018 Supp.).

Under our case law, before a trial court may terminate parental rights, it must make a two-pronged finding: first, that the parent is unfit, and second, that termination is in the best interests of the child. *In re Ta.L.*, 149 A.3d at 1081 ("The fundamental right of an individual to parent his or her child may not be terminated without a predicate determination, by clear and convincing evidence[,] that the individual is unfit to parent." (internal citation omitted)); *see also In re S.L.G.*, 110 A.3d at 1288 (characterizing the parental fitness inquiry as a "threshold determination"). This is because there is a "presumption that the child's best interest will be served by placing the child with his natural parent, provided the parent has not been proven unfit." *In re S.L.G.*, 110 A.3d at 1285-86 (citation omitted).[16] This presumption, while "not absolute," "is a strong one that reflects and reinforces the fundamental and constitutionally protected liberty interest that

---

[16] *See also In re D.S.*, 88 A.3d 678, 686 (D.C. 2014) ("The presumption is spelled out expressly in the neglect statute, which states that in abuse and neglect proceedings in the District of Columbia, it 'shall be presumed that it is generally preferable to leave a child in his or her own home.'" (citing D.C. Code § 16-2320 (a))).

natural parents have in the care, custody, and management of their children." *Id.* at 1286 (citations omitted). "Because a child's best interests are presumably served by being placed with his or her fit natural parent, a finding of parental fitness will in most cases preclude a trial court from terminating a natural parent's parental rights, except for those truly exceptional circumstances where the trial court is convinced that a continuation of the parental relationship between a fit parent and child is nonetheless detrimental to the best interest of the child." *In re Ta.L.*, 149 A.3d at 1083 (citations and internal quotation marks omitted).

We have defined fitness, which we have characterized as a "question [that] is almost always at the heart of any proceeding to terminate parental rights," *In re S.L.G.*, 110 A.3d at 1286, as "the parent's intention and ability over time to provide for a child's wellbeing and meet the child's needs," with "the basic inquiry [being] whether the parent is, or within a reasonable time will be, able to care for the child in a way that does not endanger the child's welfare." *In re Ta.L.*, 149 A.3d at 1082 (citations and internal quotation marks omitted). We have also noted that "fitness is not merely a restatement of the best interests of the child . . . [but] rather, an independent determination of parental intention and ability over time . . . to resolve the natural parent's capacity to care for the child and protect the child against

undue risk of harm." *Id*. at 1083 (citations and internal quotation marks omitted).[17]

With respect to best interests, we must consider a set of statutory factors to determine whether TPR is in the best interests of the child:

> (1) the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the difference in the development and the concept of time of children of different ages;
>
> (2) the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental, and emotional needs of the child;
>
> (3) the quality of the interaction and interrelationship of the child with his or her parent, siblings, relative, and/or caretakers, including the foster parent; [and]
>
> (4) to the extent feasible, the child's opinion of his or her

---

[17]  "[A] natural parent's unfitness may be evidenced by a variety of behaviors, conditions, and circumstances, including but not limited to past or ongoing child abuse, neglect, maltreatment, or abandonment; a failure to maintain contact with, nurture, or support the child; involvement in criminal or other activities that are seriously inimical to a child's welfare; the inability or unwillingness to make reasonable efforts to correct the behaviors or conditions that led to the child's removal from the parent's custody, to provide a safe and stable home for the child, or to meet a particular child's special needs; chronic drug or alcohol abuse; and mental health issues or other impairments that demonstrably interfere with the parent's ability to care for the child or that expose the child to undue risk of harm." *In re S.L.G.*, 110 A.3d at 1287.

own best interests in the matter.

*In re S.L.G.*, 110 A.3d at 1285 (citing D.C. Code § 16-2353 (b)).[18]  In conducting its analysis and reaching its conclusion, a trial court may only terminate parental rights if it finds by "clear and convincing evidence [] that continuing the parent-child relationship would be contrary to the best interests of the children,"[19] *id.* at 1288 (citation omitted), and its finding must be "supported by substantial reasoning drawn from a firm factual foundation." *Id.* at 1284-85 (citation omitted). We review a trial court's best interests finding in a TPR proceeding for abuse of discretion – meaning, as noted above, that "the trial court has exercised its discretion within the range of permissible alternatives, based on all relevant factors

---

[18]  There are two additional factors that are not relevant to this case: (3A) whether the child was abandoned at the hospital following birth, and (5) evidence that drug-related activity continues to exist in a child's home environment after intervention and service have been provided. *In re S.L.G.*, 110 A.3d at 1285 & n.20.

[19]  *See also Matter of A.B.E.*, 564 A.2d 751, 754 (D.C. 1989) ("The legal touchstone in any proceeding to terminate parental rights is the best interest of the child, and that interest is controlling."); *In re S.M.*, 985 A.2d 413, 419 (D.C. 2009) ("the paramount consideration must of course be the best interest of the child"); *In re Tw.P.*, 756 A.2d at 407 ("A trial court may terminate the parent-child relationship when it determines, on the basis of the evidence presented and after due consideration of the best interest of all parties, that the termination is in the best interest of the child." (citation omitted)).

and no improper factor." *Id.* at 1284 (citation omitted).[20]

In this case, as noted above, based on the combined seven-day *Ta.L.* permanency goal change hearing and TPR trial held in 2017, Magistrate Judge Albert terminated D.C.'s parental rights in January of 2018. In her decision, she made the threshold finding of parental unfitness with respect to D.C., and then found that the four applicable TPR factors weigh in favor of terminating D.C.'s parental rights in K.C.'s best interests. As with her suspension of visitation and permanency goal change decisions, the magistrate judge issued a detailed opinion that drew upon extensive evidence in the record. In April of 2018, Judge Becker issued her own opinion, examining the record and analyzing the magistrate judge's decision closely, ultimately concluding that the magistrate judge did not err in finding that there was clear and convincing evidence to support the holding that D.C.'s parental rights should be terminated – and thus affirming the decision.[21]

---

[20] As with the suspension of visitation and permanency goal change, in conducting our review, we review the final order of the associate judge, as well as the decision of the magistrate judge on which that order is based. See *supra* note 8.

[21] We note that, in making her unfitness finding, the magistrate judge appropriately cited *In re S.L.G.*, 110 A.3d 1275, 1285 (D.C. 2015), but failed to cite *In re Ta.L.*, 149 A.3d 1060 (D.C. 2016) (en banc), in which we more explicitly held that a fitness inquiry is a separate determination that must precede the best interests of the child inquiry. However, we are satisfied that the magistrate judge

(continued…)

Reviewing for abuse of discretion, we affirm. The magistrate judge and the associate judge rendered opinions that were firmly rooted in the evidence, applied the correct legal standards, and considered all relevant factors and no improper factor.

D.C. does not challenge the finding of her parental unfitness, mentioning it only briefly in her discussion of the statutory TPR factors,[22] but she challenges the trial court decisions with respect to the TPR factors. Her arguments are unavailing.

_____

(…continued)

made the requisite unfitness finding, and we note that the reviewing judge cited *Ta.L.* and conducted a proper bifurcated analysis in which a threshold finding of unfitness preceded a determination of whether the best interests of the child warranted a termination of parental rights. Moreover, as discussed below, D.C. does not appeal the unfitness finding.

[22] As noted, we held in *In re S.L.G.* that unfitness "may be evidenced by a variety of behaviors, conditions, and circumstances," and it is clear that several of those factors are present in this case, including "past [] neglect," "the inability or unwillingness to make reasonable efforts to correct the behaviors or conditions that led to the child's removal from the parent's custody, to provide a safe and stable home for the child, or to meet a particular child's special needs," and "mental health issues or other impairments that demonstrably interfere with the parent's ability to care for the child or that expose the child to undue risk of harm." *In re S.L.G.*, 110 A.3d at 1287. As discussed above, the evidence in this case clearly demonstrates that these behaviors, conditions, and circumstances were present here. Therefore it appears that the magistrate judge's finding of D.C.'s unfitness and the reviewing judge's affirmance were supported by the facts and consistent with our case law.

With respect to (1) continuity of care, the evidence established, and the associate judge found, that D.C.'s home was clearly not a stable environment for K.C., as his time with her had "left [him] with attachment problems, substandard coping skills, and educational deficits." And, while his changes in foster placements and his psychiatric hospitalizations indeed occurred after he was removed from D.C.'s care, the record indicated that D.C.'s behavior significantly contributed to K.C.'s decompensation, which manifested itself both in the increasingly conflictual relationship with his foster family and in the incident that led to his initial hospitalization. By contrast, there is no evidentiary support for D.C.'s bald assertion that, because adoption recruitment efforts for K.C. had been unsuccessful up to the time of the TPR decision, the termination is highly likely to leave K.C. without a permanent home. This is D.C.'s lay opinion, unsupported by anything in the record – and, in fact, contradicted by the testimony of a CFSA adoption recruiter at the TPR hearing that K.C. is adoptable and that CFSA would likely have more success placing K.C. in a permanent adoptive home if D.C.'s parental rights were terminated.[23]

---

[23] *See also In re Tw.P.*, 756 A.2d at 411 ("Because prospective adoptive parents are reluctant to consider an 'at risk' adoption, where a natural parent may oppose and contest their adoption efforts, [TPR] is critical to increasing the

(continued…)

As to (2) the physical, mental, and emotional health of all, we find no evidence supporting D.C.'s assertion that the trial court was focused on D.C.'s culpability rather than the condition of the child, as the magistrate judge and associate judge's opinions indicate that they considered D.C.'s mental health with respect to her fitness as a parent (which, as noted, is not challenged on appeal) and with respect to K.C.'s well-being, i.e., her ability to appreciate and appropriately address his situation and his needs. As to D.C.'s assertion that any shortcoming in her mental health status is evidence of the deficiency of the Agency's services, this is an issue that we addressed above in the context of the permanency goal change. The plan was reasonable, the Agency's efforts were reasonable, and, while D.C. technically complied with several – but not all – of the steps of the reunification plan, she refused to meaningfully engage and she frustrated the Agency's efforts, so her allegations about the deficiency of the plan and the efforts ring hollow.[24]

---

(…continued)
chances of adoption and consequently, to increasing the likelihood that the best interests of the children will ultimately be served.").

[24] *See In re A.B.*, 955 A.2d at 164-66 (in reviewing a TPR decision, this court noted the mother's failure to fully comply with the plan, including with respect to mental health treatment and visitation, and noted her persistent inability to appreciate the child's situation and needs).

In addition, D.C. correctly notes that K.C. continued to experience behavioral health challenges after his removal from her care, but, as mentioned, D.C.'s own behavior appeared to be a significant cause of K.C.'s initial destabilization, which was quite serious and may have had lingering effects for some time.  Moreover, as the reviewing judge noted in the context of the child's opinion of his own best interests, there could be many reasons that a child in foster care would have trouble adjusting to his new reality, and this does not demonstrate that he would have been better off with D.C.  Indeed, the evidence indicated that he would have been even worse off with D.C., which is what informed the magistrate judge and the reviewing judge's analyses of the TPR factors in light of the child's best interests.

With regard to her arguments about (3) the quality of interaction and interrelationship, the trial court did not, as D.C. contends, fail to consider K.C.'s ongoing behavioral challenges after his removal from D.C.'s care.  As noted in the discussion regarding the second TPR factor above, the reviewing judge acknowledged, and we acknowledge, that there can be many sources of such challenges – including D.C. herself.  Yet, even if D.C. had not been a contributing factor, it would be wholly unreasonable to expect a child who had been removed from his home and placed into foster care, even under the best of circumstances, to

be free from behavior challenges. While removal may be in the best interests of a child – indeed, that is why it is done – it is nonetheless a very difficult adjustment for the child, and it is unsurprising that K.C. struggled. Moreover, K.C.'s challenges were no doubt exacerbated as a result of his upbringing with his mother, which, as discussed, left him with significant emotional and educational deficits.

The Superior Court judges also considered the fact that K.C. and D.C. had no interaction following the suspension of visitation. Again, the reviewing judge specifically acknowledged this and stated that, while there was no evidence regarding that particular interaction, there was evidence of K.C.'s interactions with others since he left his mother's care, and that he was improving and progressing, which she rightly considered relevant. *See In re Tw.P.*, 756 A.2d at 410 ("evidence . . . that the children progressed emotionally and psychologically when they were apart from their natural parents in stable environments like those they enjoyed with their longer-term foster care families" was relevant to TPR analysis). As to D.C.'s assertion that the trial court did not consider that the loss of interaction with his mother would be detrimental to K.C., the magistrate judge examined, and the associate judge reviewed, the history of D.C.'s interaction with K.C. during one year of supervised visitation; both found that the loss of interaction with D.C. would be, on balance, less detrimental to K.C. than the

continuation of interaction with her. Thus, the trial court decisions thoughtfully considered and addressed all of these issues in their factual findings and legal conclusions.

And finally, as to (4) the child's opinion of his own best interests, as noted, D.C. asserts that, "[a]bsent powerful evidence to the contrary, it should be presumed that K.C. believes it is in his own best interests to be returned to his mother." While D.C. cites no legal authority in support of this presumption, we note that the magistrate judge, as factfinder, squarely addressed this issue and took into account relevant evidence. She held that K.C. was too young to express an opinion regarding his own best interests, which is consistent with our case law holding that whether to elicit testimony from children on this point is "within the judge's discretion, taking into account whether children are old or competent enough to voice an opinion." *In re J.L.*, 884 A.2d 1072, 1080 (D.C. 2005). We have also observed that, "in many cases the most probative evidence of the child's opinion may lie in statements the child has made to others such as psychologists or in the child's past behavior," *id.* at 1079-80 (citations omitted), and the reviewing judge did take note of statements that K.C. had made to his play therapist, as well

as K.C.'s behavior outside of his mother's care.[25]   Based on this evidence, the

magistrate judge found, and the associate judge affirmed, that this factor weighs in

favor of termination.  We discern no error in the factfinding or application of legal

principle here.


## V. CONCLUSION


For these reasons, we affirm the suspension of visitation, the permanency

---

[25] Similarly, in *In re T.W.M.*, we stated:

> "The court was required, under D.C. Code § 16-2353 (b)(4), to consider, 'to the extent feasible,' [the child's] opinion about [her] own best interests.  However, while 'it is preferable for judges to hear directly from the children involved in such proceedings if it is at all feasible to do so,' 'the statute does not say the judge must derive this opinion even partly from questioning of the child' himself." *In re B.J.*, 917 A.2d 86, 92 (D.C. 2007) (internal citations omitted).  "Thus . . . the trial court had no per se duty to ascertain [the child's] opinion through the child's direct testimony or statements." *Id.* "'Indeed, common sense suggests that in many cases the most probative evidence of the child's opinion may lie in statements the child has made to others such as psychologists or in the child's past behavior, rather than in testimony given in the formal surroundings of a court proceeding.'" *In re J.L.*, 884 A.2d 1072, 1079-80 (D.C. 2005) (quoting *In re T.W.*, 623 A.2d 116, 117 (D.C. 1993)).

*In re T.W.M.*, 18 A.3d 815, 822 (D.C. 2011).

goal change to adoption, and the termination of parental rights.

*So ordered.*